No. 102,265

STATE OF KANSAS, *Appellee*, v. VERNON GILLILAND, *Appellant*.

(276 P.3d 165)

520

Opinion filed May 11, 2012.

*Patrick H. Dunn,* of Kansas Appellate Defender Office, argued the cause, and *Heather Cessna,* of the same office, was on the brief for appellant.

*Christina M. Trocheck,* assistant county attorney, argued the cause, and *Ellen Mitchell,* county attorney, and *Steve Six,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Vernon Ray Gilliland was convicted by a jury of one count of aggravated criminal sodomy with a child under 14 years of age. Because Gilliland was over the age of 18 at the time of the offense, his conviction was for an off-grid person felony. K.S.A. 21-3506(a)(1), (c). On direct appeal, Gilliland seeks reversal of his conviction by arguing the trial court erred in: (1) denying his motion to suppress his statements to the law enforcement officer at the scene; (2) denying his motion to suppress the recordings of jailhouse telephone conversations; (3) excluding evidence under K.S.A. 21-3525(b), commonly known as the Kansas rape shield statute, regarding the victim's previous sexual conduct; (4) denying his motion to hold a pretrial taint hearing to determine the reliability of the victim's testimony and statements to law enforcement officers; and (5) giving an *Allen*-type jury instruction. Gilliland also

argues that cumulative errors deprived him of a fair trial. We reject these arguments and affirm his conviction.

Gilliland additionally raises several sentencing issues. Under Jessica's Law, K.S.A. 21-4643(a), the prescribed sentence for Gilliland's conviction was life imprisonment. Although the sentencing court denied Gilliland's motion for a departure sentence, the court did not impose a life sentence. Instead, the court imposed a sentence under the Kansas Sentencing Guidelines Act, K.S.A. 21-4701 *et seq.*, for a specific term. Thus, the effect of the sentence was contrary to the explicit finding of the sentencing court. Because of the ambiguity created by a finding that contradicts the sentence, creating an illegal sentence, we vacate the sentence and remand for resentencing. As a result, no other sentencing issues are ripe.

## FACTS AND PROCEDURAL BACKGROUND

Since the end of 2002, Gilliland lived in Salina, Kansas, with his girlfriend Charlotte and her two children, D.N. and C.E. On the morning of June 9, 2007, Gilliland woke up and went to the liquor store to purchase a bottle of liquor. He drank the contents and then returned to the store to buy another bottle of liquor, which he also drank. Gilliland subsequently walked to a local bar, where he stayed a "couple hours" and drank some more—according to Gilliland as many as 15 more drinks—such as "Jack and Cokes," "mixed drinks," and "beer." He played some video games and games of pool and then walked home.

When Gilliland got home from the bar, it was early in the afternoon. Charlotte was sleeping, and her two children were eating breakfast. D.N., Charlotte's son, eventually went back to his bedroom to take a nap. Gilliland laid down on the couch in the living room and watched sports on the television. C.E., Charlotte's 12-year-old daughter, sat in a nearby chair. At some point, according to Gilliland's trial testimony, he felt a tingling sensation in the back of his head. Then, he said he either fell asleep or "passed out" on the couch and woke up to the feeling of Charlotte pulling his hair. He opened his eyes and found C.E. straddling him with her bare buttocks near his face. Gilliland said he felt "[k]ind of out of it."

Gilliland related the tingling sensation in the back of his head to a seizure. Gilliland suffers with epilepsy and, since approximately 1997, experiences seizures. Although he takes a daily anti-seizure prescription medication for epilepsy, he continues to have occasional seizures. Gilliland's seizures become more frequent with alcohol use. He has also experienced alcohol-withdrawal seizures. A seizure can cause an episode of unconsciousness, and Gilliland is disoriented for a short time when coming out of a seizure.

Another account of the June 9 events was given by Charlotte, whose statements changed over time. In her initial police interview, Charlotte said that around 3 p.m., she walked out into the living room where she saw C.E., with her skirt pulled up and bare buttocks exposed, "sitting" on Gilliland's face. Charlotte reported that Gilliland was fully clothed and lying on his back, and C.E. was positioned so she was facing his feet. Charlotte approached them from behind and could see C.E.'s bare buttocks and Gilliland's forehead. She told officers that Gilliland's "mouth was on the genitals." Charlotte yelled at C.E. and told her to go to her room and then "yanked" Gilliland's hair. She initially told officers, "I just remember grabbing a handful of hair and [C.E.] jumped and he jumped and [C.E.] went to her room." Charlotte then yelled at Gilliland and hit him with a telephone.

Subsequently, when Charlotte recounted the events, she claimed Gilliland's left hand was hanging "limp" off the edge of the couch, and she had to yank on Gilliland's hair a second time before he "woke up." During trial, Charlotte testified that Gilliland had a "glassy look in his eyes," was "searching for words," and was "bumping into things." "[It was] like talking to someone who's not there." These details were not mentioned in her initial statements to officers.

At some point, Charlotte sent the children outside and called her friend Gina Fletcher, who came over to the house right away. After hearing what happened, Fletcher called 911.

Law enforcement dispatch advised Officer Anthony Fontanez that a 12-year-old girl was possibly molested in the preceding 30 minutes. When Fontanez arrived at the residence around 3:45 p.m., Gilliland was standing on the front porch, and Charlotte and

Fletcher were nearby. He initially talked to Fletcher, who told him that Charlotte had walked in on Gilliland giving C.E. "oral sex." Based on this information, the officer approached Gilliland and asked him, "Is that what happened?" to which Gilliland responded, "Yeah, that's what happened." At that point, the officer immediately *Mirandized* Gilliland. Then, the officer asked some clarifying questions—"Let me get this right—you and the 12 year old?" Gilliland answered, "Yes." The officer asked, "What were you doing?" and Gilliland responded, "Oral sex." Then, the officer placed Gilliland into custody. As he was placing handcuffs on Gilliland, he smelled the faint odor of alcohol.

Gilliland filed several pretrial motions. In two motions, he sought to suppress evidence. One of these motions related to his statements to Fontanez and another officer who interviewed him on the day of the alleged incident, and the second related to jailhouse recordings of telephone conversations between himself and Charlotte. Both motions were denied. Several other motions related to the victim, C.E. Specifically, Gilliland requested a psychological evaluation of C.E.; sought the admission of evidence of C.E.'s previous sexual conduct under the Kansas rape shield statute, K.S.A. 21-3525(b); and sought to exclude from trial C.E.'s testimony and evidence of her statements to officers. The trial court allowed the psychological examination of C.E. but denied all other motions.

At the jury trial, Gilliland presented the defense that he was unconscious during the alleged incident and could not have performed the charged crime. In making this claim, he did not assert a defense of voluntary intoxication. (Indeed, he could not have because he was charged with a general intent crime, see *State v. Prine*, 287 Kan. 713, 727, 200 P.3d 1 [2009], and voluntary intoxication is not a defense to general intent crimes under K.S.A. 21-3208[2]. *State v. Brown*, 291 Kan. 646, 654, 244 P.3d 267 [2011]). Rather, at least on appeal, his claim of unconsciousness is based on his history of epilepsy.

The defense presented the testimony of Dr. William Logan as an expert witness. Dr. Logan is board certified in psychiatry, neurology, and forensic psychiatry. Based on Dr. Logan's evaluation of Gilliland, Dr. Logan testified Gilliland had a history of two dif-

ferent conditions that "could have affected him" during the incident. One condition was a seizure disorder, "which could have produced an episode of unconsciousness." The other condition was alcoholism, which could involve "episodes of intoxication that produced blackouts." Dr. Logan explained that a "blackout" is not necessarily a "time of unconsciousness but it is a time when the individual may not have a memory later of what transpired and during that time when they're intoxicated their judgment might be impaired and they might be inclined to show unusual behavior that they wouldn't if they were sober." This type of "alcoholic manifesto event" is different from a seizure in that a person "perform[s] some sort of behavior and it may be very well organized behavior but afterwards you do not remember it." Dr. Logan admitted that while it was possible that Gilliland was either (1) unconscious or (2) blacked out at the time of the incident, that is, he acted knowingly but had no memory of his actions, it was also possible that he simply (3) feigned memory loss and knowingly pulled C.E. on top of him and knowingly licked her vagina.

The jury apparently rejected the claim that Gilliland was having a seizure because it convicted him of aggravated criminal sodomy. On direct appeal, he attacks his conviction and sentence. More facts, including more details related to the various motions, will be discussed below, as needed.

### Issue 1: Suppression of Statements

Gilliland's first issue on appeal is that the trial court erred in denying his motion to suppress his statements to Fontanez, the first responding law enforcement officer at the scene. Gilliland makes two arguments based on separate legal theories.

In one argument, he seeks to suppress his pre-*Miranda* statement to the officer—his affirmative response to the officer's question, "Is that what happened?" Gilliland argues he was in custody when the officer asked the question and therefore he had a right to receive his *Miranda* warnings before the officer began the interrogation. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966).

In the second argument, Gilliland focuses on his post-*Miranda* statements to the officer. Gilliland argues his answers, in which he verified that he had oral sex with a 12 year old, should have been suppressed because he was under the influence of alcohol and, as a result, his waiver of *Miranda* rights was not voluntary.

*Standard of Review*

An appellate court uses a well-known bifurcated standard when reviewing the suppression of a defendant's statements:

"In reviewing a trial court's ruling on a suppression issue, the appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. [Citations omitted.]" *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010).

a. *Pre*-Miranda *Statement*

The State argues that Gilliland failed to preserve the question of whether his pre-*Miranda* statements must be suppressed.

For an evidentiary issue to be preserved for appeal under K.S.A. 60-404, "the trial court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error." *State v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 (2009). Thus, a defendant may not object to the introduction of evidence on one ground at trial and then assert a different objection on appeal. *State v. McCaslin*, 291 Kan. 697, 707, 245 P.3d 1030 (2011); *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 1148 (2005); *State v. Goseland*, 256 Kan. 729, Syl. ¶ 1, 887 P.2d 1109 (1994).

Our independent review of the record confirms the State's assertion: Gilliland did not assert a specific objection regarding a *Miranda* violation. At oral argument before this court, Gilliland's attorney argued the motion to suppress was sufficiently broad to incorporate the objection. We reject this contention. Gilliland's motion to suppress and his arguments at the suppression hearing did not distinguish between pre-*Miranda* and post-*Miranda* statements and solely focused on his post-*Miranda* statements. He contended these "statements to police on June 9, 2007," should be

suppressed because he was "under the influence of an intoxicant at the time of questioning" and he "did not knowingly and voluntarily waive" his constitutional rights. Thus, the focus was on his mental acuity and whether his "statements to police were involuntary." This is a distinct legal theory from the question of whether a person is in custody and, therefore, entitled to be advised of his or her rights under *Miranda*.

When defense counsel renewed Gilliland's objection to the admission of the statements at trial, there was no mention of the pre-*Miranda* custody issue or a *Miranda* violation. Thus, the trial court never had the opportunity to rule on the pre-*Miranda* issue that Gilliland asserts for the first time on appeal.

Because Gilliland failed to object to the pre-*Miranda* statements at trial, he failed to preserve the issue for appeal.

### b. *Post*-Miranda *Statements*

Immediately after Gilliland's statement, "Yeah, that's what happened," Fontanez notified Gilliland of his *Miranda* rights, received Gilliland's waiver, and asked, "Let me get this right—you and the 12 year old?" Gilliland answered, "Yes." The officer asked, "What were you doing?" and Gilliland responded, "Oral sex." Gilliland was handcuffed and officially placed into custody. Gilliland argues these statements were not voluntary.

To determine whether an accused's confession is voluntary, a court looks at the totality of the circumstances. The prosecution bears the burden of proving that a confession is admissible by a preponderance of the evidence. Nonexclusive factors include: (1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. *State v. McMullen*, 290 Kan. 1, 4, 221 P.3d 92 (2009); *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 (2008).

In *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009), this court described the weight an appellate court should give these factors:

" '[T]hese factors are not to be weighed against one another . . ., with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' [Citations omitted.]"

In this appeal, Gilliland only addresses one factor, his mental condition as impacted by his intoxication. " 'The fact that an accused had been drinking and using drugs does not per se establish involuntariness.' " *State v. Norris*, 244 Kan. 326, 334-35, 768 P.2d 296 (1989) (quoting *State v. Baker*, 4 Kan. App. 2d 340, 343, 606 P.2d 120 [1980]). All circumstances surrounding the giving of the statement must be examined to determine if the intoxication prevented the accused from voluntarily making a statement. See *State v. Swanigan*, 279 Kan. 18, 23-40, 106 P.3d 39 (2005) (court will look at all circumstances surrounding the giving of statement to determine whether statement was product of free and independent will of the accused).

To make this assessment, in past cases we have noted a variety of factors that provide substantial competent evidence regarding a trial court's determination that drug or alcohol use did or did not prevent an accused from making a voluntary statement. These factors have included such things as whether there were manifestations of intoxication, the opinions of those who interacted with the accused about whether the accused seemed intoxicated, the trial court's independent evaluation based on observing or hearing the accused in a video or audio recording of the statement, the accused's familiarity with the police's interview procedures, and the accused's familiarity with the *Miranda* rights. Courts have noted markers such as whether an accused's answers were precise, normal, rational, or responsive; whether the accused was coherent and wide awake; and whether there was a detectable odor, swaying, bloodshot eyes, slurred speech, or other physical signs of intoxication. If the trial court has relied on some of these factors in ruling a statement was voluntary, an appellate court examines only

whether there is substantial competent evidence to support the trial court's findings; an appellate court does not reweigh the evidence or independently reach our own determination of voluntariness. See, *e.g.*, *State v. Harris*, 293 Kan. 798, 807-09, 269 P.3d 820 (2012) (at time of statement, defendant said nothing about drug or alcohol consumption and did not appear impaired to officers); *State v. Bogguess*, 293 Kan. 743, 752-53, 268 P.3d 481 (2012) (defendant told officers of drug use but that effect had worn off, and he appeared lucid); *State v. Cofield*, 288 Kan. 367, 370-72, 203 P.3d 1261 (2009) (although defendant reported using drugs, he gave detailed statement with explicit descriptions in response to open-ended questions); *State v. Kirkpatrick*, 286 Kan. 329, 341-42, 184 P.3d 247 (2008) (defendant answered questions normally and appeared to be tracking, no detectible odor of alcohol or marijuana, and officer did not suspect intoxication); *State v. Bell*, 280 Kan. 358, 364, 121 P.3d 972 (2005) (trial court observed defendant's demeanor on videotape was similar to his demeanor in the courtroom); *State v. Donaldson*, 279 Kan. 694, 713-14, 112 P.3d 99 (2005) (detective testified defendant responded appropriately and did not appear intoxicated); *State v. Jacques*, 270 Kan. 173, 188-89, 14 P.3d 409 (2000) (defendant answered questions coherently, followed the conversation, had experience with the *Miranda* form, and had been questioned by officers on previous occasion); *State v. McCorkendale*, 267 Kan. 263, 271, 979 P.2d 1239 (1999) (defendant appeared "coherent" when speaking with officers, understood his *Miranda* rights, rationally responded to officers' questions, and did not have slurred speech), *overruled on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009).

In this case, conflicting evidence was presented regarding many of these factors or markers. Some evidence supports that Gilliland was highly intoxicated. In Charlotte's and Fletcher's testimony, they said things like: Gilliland's speech was "[s]lurred and kind of slow"; he was "staggering, like he was having problems walking a little bit"; "[h]is eyes were kind of closed"; and "he didn't seem like he was completely coherent." Charlotte also testified that she later found two empty liquor bottles under the couch. Gilliland reported a high alcohol intake and claimed he could not remember

"much" about the day of the incident. He said he remembered a "little bit" of what the officer was saying to him. On cross-examination, when asked if he knew he had a right "not to talk to" Fontanez, Gilliland said, "Well, yeah, I know my *Miranda* rights, but, hell, at the time I didn't know nothing" because of the alcohol. Gilliland further claimed that he was still "buzzed" when he spoke to officers at the police station.

On the other hand, contrary to Gilliland's claim that he could not remember much about the day, he was able to recount considerable detail regarding his two trips to the liquor store; his visit to a bar, including the number and types of drinks he consumed while there; his return home where he remembered watching sports on television and that C.E. was eating cereal and D.N. was having waffles; his awakening when Charlotte pulled his hair; his arrest; his trip to the police station; and his interrogation at the police station. He testified he remembered Fontanez as the officer who was on the scene, and he admitted he had been *Mirandized* on past occasions.

Additionally, Fontanez and Officer Shawn Moreland, who transported Gilliland to the police station and later interviewed him, testified on behalf of the State at the suppression hearing. The record shows that Fontanez made an audio recording of his contact with Gilliland, Charlotte, and Fletcher, and the recording was played for the judge at the suppression hearing. Fontanez testified Gilliland was standing freely, not swaying or staggering, never stumbled, was able to respond quickly and coherently to his questions, and needed no assistance getting into the patrol car. The officer also thought Gilliland's speech was clear and understandable. It was not until the officer was placing handcuffs on Gilliland that he smelled the odor of alcohol. According to Fontanez, nothing about Gilliland's demeanor made him appear to be under the influence of alcohol or unable to understand the officer's questions. In fact, before telling Gilliland to get into the patrol car, Fontanez asked him if he had anything sharp or illegal in his pockets, and Gilliland reported there was a knife in his pocket.

Moreland's interview of Gilliland occurred at the police station a couple hours later. Moreland testified at the suppression hearing

that before questioning Gilliland, he advised Gilliland of his *Miranda* rights, and Gilliland signed a written waiver. When asked about Gilliland's activities during the day, Gilliland answered in considerable detail. When questioning turned to the alleged incident, Gilliland said he did not want to answer any other questions without his attorney present. The interview was then terminated.

After hearing this evidence, the trial court denied the motion to suppress. The court applied the correct standard, noted the evidence it had heard, and concluded that while Gilliland's "[v]ery self-serving testimony and selective recall of events . . . may be indicative of some degree of intoxication[, they] also would belie such intoxication that would prevent the defendant from having made a voluntary statement."

There is substantial competent evidence to support this conclusion. Gilliland was coherent, responsive to questions, and able to remember many details about the day. According to Fontanez, Gilliland did not exhibit any physical signs of intoxication, except an odor of alcohol that could be detected only when the officer was close enough to place Gilliland in handcuffs. And he was familiar with *Miranda* warnings from past encounters and demonstrated his right to exercise his right to remain silent by cutting off Moreland's interview. Furthermore, there are no other factors suggesting that the statement was involuntary.

The trial court did not err in denying Gilliland's motion to suppress his post-*Miranda* statements.

## Issue 2: Suppression of Recorded Jailhouse Telephone Conversations

Next, Gilliland argues the trial court erred in denying his motion to suppress the recordings of his jailhouse telephone conversations with Charlotte. The same standard of review applies to this issue.

The conversations at issue occurred while Gilliland was being held in the Saline County Jail on the charges in this case. During that time, his telephone conversations with Charlotte were recorded as part of jail policies and procedures. At the beginning of each conversation, the recording system sent out an audio warning to the participants, stating, "This call is subject to monitoring or

recording." Gilliland had multiple conversations with Charlotte about his defense strategy, his hopes that C.E. would not testify, and the possibility that Charlotte might be called to testify against him and how they could avoid it. Several recordings were entered into evidence at trial and played in open court, presumably to attack the credibility of Gilliland's defense that he was unconscious during the incident in question.

In Gilliland's motion to suppress, he argued the interception of these telephone calls violated his reasonable expectation of privacy in violation of two criminal statutes, K.S.A. 21-4001 (eavesdropping) and K.S.A. 21-4002 (breach of privacy).

The basic premise of Gilliland's argument—that he had a reasonable expectation of privacy in his jailhouse conversations—fails to recognize the limits on a prisoner's right to privacy. The right to privacy under the Fourth Amendment to the United States Constitution is measured by a two-part test: (1) The person must have a subjective expectation of privacy; and (2) that expectation must be one that society recognizes as reasonable. *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). Generally, a jail or prison inmate's right of privacy, at least outside the context of communications with an attorney, fails both prongs of the *Katz* test. First, an inmate's privacy interest is severely limited by the status of being a prisoner and by being in an area of confinement that "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Lanza v. New York*, 370 U.S. 139, 143, 82 S. Ct. 1218, 8 L. Ed. 2d 384 (1962). Second, "society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." *Hudson v. Palmer*, 468 U.S. 517, 528, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). Therefore, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson*, 468 U.S. at 526.

Similar limitations have been found to apply to telephone conversations of prisoners. These limitations rest on the doctrine that the Fourth Amendment prevents the government from tapping a person's telephone or otherwise eavesdropping on *private* conver-

sations without good cause and a proper search warrant; if a conversation is not private, the Fourth Amendment protections do not apply. See *Katz*, 389 U.S. at 357-59. Hence, the reduced expectation of privacy in a jail or prison setting necessarily defeats an inmate's claim of a reasonable expectation that his or her calls are private under the Fourth Amendment. See, *e.g.*, *United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir.), *cert. denied* 519 U.S. 912 (1996) (holding that individuals who are incarcerated while awaiting trial do not have any expectation of privacy in outgoing telephone calls that are made on jail telephones); *Romo v. Champion*, 46 F.3d 1013, 1017-18 (10th Cir.), *cert. denied* 516 U.S. 947 (1995) (recognizing that prison authorities must be afforded wide-ranging discretion in adopting policies designed to preserve institutional security); *Jackson v. State*, 18 So. 3d 1016, 1030 (Fla. 2009), *cert. denied* 130 S. Ct. 1144 (2010) (defendant was aware through automated warnings that jail would record and monitor his communication and, thus, implicitly consented to the interception; defendant did not have a legitimate, reasonable expectation of privacy under the circumstances; interest in institutional security allowed jailhouse conversations to be monitored); *State v. Maass*, 275 Kan. 328, 335, 64 P.3d 382 (2003) (convicted persons have diminished expectation of privacy in the penal context).

Furthermore, the State argues that Gilliland's statutory argument also fails because, through his actions, he consented to having his calls monitored, and the statutes he cites—K.S.A. 21-4002 and K.S.A. 21-4001(a)(3)—contain a consent exception. Gilliland does not disagree with this interpretation of the statutes but contends he did not consent.

One of the statutes on which Gilliland relies, K.S.A. 21-4002(a)(1), prohibits "[i]ntercepting, *without the consent* of the sender or receiver, a message by telephone . . . or other means of private communication." (Emphasis added.) The other statute, K.S.A. 21-4001(a)(3), deals with violations of personal rights and prohibits, in part, the use of "any device or equipment for the interception of any telephone . . . or other wire communication *without the consent* of the person in possession or control of the facilities for such wire communication." (Emphasis added.) In this

appeal, the parties have not discussed the meaning of the phrase "the person in possession or control of the facilities for such wire communication" and whether Gilliland would qualify. Because the parties have assumed Gilliland is in possession or control, we will proceed on this assumption, even though this point seems subject to debate, and will consider the parties' arguments regarding whether Gilliland consented.

Gilliland, in arguing that he did not give adequate consent to the recordings, asserts the "simple warning that the calls are being monitored or recorded is insufficient to put the jail inmate on notice that those calls may ultimately be utilized in his or her prosecution." Gilliland acknowledges a similar argument was rejected in *State v. Andrews*, 39 Kan. App. 2d 19, 176 P.3d 245 (2008), in the context of Kansas' wiretapping statutes, K.S.A. 22-2514 *et seq.* Nevertheless, Gilliland contends, without citing any supporting authority, that *Andrews* was wrongly decided.

In *Andrews*, the defendant filed a motion to suppress recordings of his jailhouse telephone conversations. Citing the wiretap statutes, Andrews contended the Johnson County Sheriff's Department was required to get judicial approval before it could record or listen to his outgoing telephone calls.

At the suppression hearing, testimony established that a prisoner's telephone calls were monitored as a way to assist in maintaining the security of the jail. The jail policy handbook, which was available to inmates, discussed the telephone monitoring system and advised that calls were recorded. During all conversations, the system sent out an audio warning informing both parties that the call was being recorded.

The trial court denied Andrews' motion to suppress and ruled that Andrews, by using the jail telephones, consented to his conversations being monitored and recorded. The court concluded that fair warnings were given to inmates and there was no reasonable expectation of privacy. Consequently, there was no violation in light of the valid consent.

The Court of Appeals affirmed, noting that Andrews' consent meant the wiretapping statute did not prevent the recording. *Andrews*, 39 Kan. App. 2d at 25. The *Andrews* court quoted K.S.A.

22-2515(c), which allows the contents of a conversation to be disclosed in court if the information was received "by any means authorized by this act or by chapter 119 of title 18 of the United States code." Chapter 119 of Title 18 of the United States Code includes 18 U.S.C. § 2511(2)(c) (2006), which states: "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has *given prior consent* to such interception." (Emphasis added.)

The *Andrews* court reiterated the various warnings that were given and concluded: "[B]ased on all the warnings in the case," Andrews gave consent. *Andrews*, 39 Kan. App. 2d at 24. In support of this conclusion, the *Andrews* court looked to a decision of the Wisconsin Court of Appeals in *State v. Riley*, 287 Wis. 2d 244, 704 N.W.2d 635 (2005), where the Wisconsin Electronic Surveillance Control Law (WESCL), a statute mirroring the language of 18 U.S.C. § 2511(2)(c), was applied to hold that a prisoner consented to a recording when he used the phone after hearing a recording that stated the call may be recorded.

The *Riley* court reviewed federal circuit court cases applying the consent exception of 18 U.S.C. § 2511(2)(c) in prison settings because the WESCL, like K.S.A. 22-2514 *et seq.*, was patterned after Title III of the federal Omnibus Crime Control and Safe Streets Act of 1968. *Riley*, 287 Wis. 2d at 251; see generally *State v. Farha*, 218 Kan. 394, 398, 544 P.2d 341 (1975), *cert. denied* 426 U.S. 949 (1976). Summarizing these cases, the *Riley* court noted that the federal circuit courts "have overwhelmingly concluded that an inmate has given implied consent to electronic surveillance when he or she is on notice that his or her telephone call is subject to monitoring and recording and nonetheless proceeds with the call. [Citations omitted.]" *Riley*, 287 Wis. 2d at 251.

The Wisconsin court spoke of the notice requirement as one of "meaningful notice." In discussing what "meaningful notice" meant for purposes of providing implied consent to surveillance of institutional telephone calls, the Wisconsin court stated:

"Meaningful notice may include a signed acknowledgment form, an informational handbook or orientation session, a monitoring notice posted by the outbound telephone, or a recorded warning that is heard by the inmate through the telephone receiver, prior to his or her making the outbound telephone call. *See* [*United States v.*] *Footman*, 215 F.3d [145,] 154 [1st Cir. 2000] (signed form, notices on phones and prerecorded messages played when phone calls placed); [*United States v.*] *Amen*, 831 F.2d [373,] 379 [2d Cir. 1987] (federal prison regulations, orientation lecture, informational handbook and signs posted); [*United States v.*] *Willoughby*, 860 F.2d [15,] 20 [2d Cir. 1988] (orientation lecture, signs posted, signed form); [*United States v.*] *Workman*, 80 F.3d [688,] 693 [2d Cir. 1996] (posted signs, orientation handbook and signed form); [*United States v.*] *Hammond*, 286 F.3d [189,] 191-92 [4th Cir. 2002] (handbook, consent form, orientation lesson, and notices posted near phones); [*United States v.*] *Horr*, 963 F.2d [1124,] 1126 [8th Cir. 1992] (orientation handbook and lesson, consent form, posted signs); [*United States v.*] *Van Poyck*, 77 F.3d [285,] 292 [9th Cir. 1996] (posted signs, consent form and prison manual); *People v. Kelley*, [103 Cal. App. 4th 853, 858-59,] 127 Cal. Rptr. 2d 203, 206-07 (Ct. App. 2002) (citing federal cases for proposition that meaningful notice would include a monitoring notice posted by a phone '*or a recorded warning that is heard by the inmate*') (emphasis added; citation omitted) [, *overruled on other grounds by People v. Windham*, 145 Cal. App. 4th 881, 51 Cal. Rptr. 3d 884 (2006)]." *Riley*, 287 Wis. 2d at 253-54.

See also *United States v. Faulkner*, 323 F. Supp. 2d 1111, 1117-18 (D. Kan. 2004) (discussing other cases and holding notice before use of phone was sufficient to satisfy consent exception to federal wiretapping act).

In *Andrews*, our Court of Appeals applied these authorities and held that Andrews knowingly consented to the monitoring of his telephone calls by using the phone after hearing the recording. *Andrews*, 39 Kan. App. 2d at 24-25. Because of this consent, the federal wiretap laws allowed the recording of the conversation. And, the *Andrews* court concluded, because the recording was allowed under the federal law, the Kansas statute allowed the introduction of the recordings into evidence.

This conclusion is not directly applicable in this case because Gilliland does not rely on the wiretap statute, as Andrews did, but on K.S.A. 21-4001 (eavesdropping) and K.S.A. 21-4002 (breach of privacy), and neither of these statutes are mentioned in *Andrews*. Nevertheless, the analysis is applicable because K.S.A. 21-4001 and K.S.A. 21-4002, like Kansas' criminal procedure wiretapping stat-

utes, closely parallel the federal Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2511 (2006). See *State v. Wigley*, 210 Kan. 472, 474, 502 P.2d 819 (1972). And K.S.A. 21-4002(a)(1) provides for an exception to the statutory right of privacy if one party to the communication consents. Likewise, K.S.A. 21-4001(a)(3) does not apply if there is consent from the person in control or possession of the facilities for the wire communication, who the parties interpret to be Gilliland.

Gilliland argues we should not adopt the *Andrews* reasoning and should impose a *Miranda*-like requirement notifying an inmate that anything he or she says can be used in court. Gilliland cites no support for this contention, however. Nor does he explain a reason such a warning would be required, and we can discern no doctrinal basis for extending the right in this circumstance. The *Miranda* rights are designed to protect constitutional rightsrights that are not at issue here. But an inmate does not have a constitutional right to privacy in a jail settingthe only constitutional right mentioned by Gilliland. See *Faulkner*, 323 F. Supp. 2d at 1118 (use of phone in jail a privilege; neither pretrial detainee nor sentenced prisoner have full range of freedoms of unincarcerated individual). Consequently, we find no basis to impose the *Miranda*-style warning in the situation of a jail or prison recording an inmate's telephone conversation.

We adopt the analysis in *Andrews* and apply it to the statutes relied upon by Gilliland. Under the *Andrews* analysis, reasonable notice was given to Gilliland. Testimony from a surveillance officer at the county jail established that the jail telephones were wall-mounted and were not located in any type of privacy enclosure. Further, the officer testified Gilliland and the other inmates were warned that telephone calls they made from the county jail were being recorded. The same audio warning was played when inmates and visitors communicated by telephone through glass panels inside the jail. Additionally, the jail's written policies made it clear that conversations were recorded except for conversations between inmates and their attorneys, which are *not* recorded due to the attorney-client privilege.

Given the warnings at the beginning of a telephone conversation that telephone conversations would be monitored and might be recorded, Gilliland knowingly consented to the recording of his phone conversations through his action of using the phone, and whatever rights he had under K.S.A. 21-4001 and K.S.A. 21-4002 were not violated.

The trial court did not err in denying Gilliland's motion to suppress the recorded jailhouse conversations.

### Issue 3: Exclusion of Evidence under Rape Shield Statute

Next, Gilliland argues that the trial court erred by excluding evidence under K.S.A. 21-3525, commonly known as the Kansas rape shield statute. At trial, Gilliland sought to introduce evidence of C.E.'s history of exhibiting sexual behavior, including evidence of C.E. masturbating with dolls at a young age; "humping" the arm of the living room couch on a couple occasions; infringing on the personal space of others; touching both men and women in places, such as their inner thigh, that made them uncomfortable; being "clingy"; and grabbing the groin area of men. Gilliland argues the evidence should have been admitted because it went to the element of Gilliland's intent or lack thereof. In other words, the evidence supported the defense theory that Gilliland was unconscious at the time of the incident and it was C.E. who, of her own volition, climbed on top of Gilliland. He argues that without evidence of C.E.'s prior behavior and tendencies, his argument that she climbed on top of him was implausible.

In making this argument, Gilliland not only focuses on the ultimate admissibility of the evidence, he also takes issue with the legal standard used by the trial court in ruling that the evidence was inadmissible. He essentially contends the trial court determined relevance based on whether C.E.'s statements were corroborated, instead of simply considering whether the evidence of C.E.'s previous sexual conduct was relevant.

This argument questions the adequacy of the legal basis for the trial court's decision to exclude the evidence, which is a question an appellate court reviews de novo. *State v. Reid*, 286 Kan. 494,

503, 186 P.3d 713 (2008) (quoting *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 [2006]).

The legal basis for determining the admissibility of all evidence is relevance. See *State v. Berriozabal*, 291 Kan. 568, Syl. ¶ 7, 243 P.3d 352 (2010); *Reid*, 286 Kan. at 507-09. Relevance, in addition to being the focus of general considerations regarding the admission of evidence, is the key consideration when applying the rape shield statute, K.S.A. 21-3525, which prohibits the admission of evidence of an aggravated criminal sodomy victim's "previous sexual conduct with any person including the defendant[,]" unless the trial court first determines the evidence to be relevant and otherwise admissible. K.S.A. 21-3525(a)(5), (b).

K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. *Berriozabal*, 291 Kan. 568, Syl. ¶ 7. In determining whether the evidence is "material," the analysis focuses on whether the fact to be proved is " 'a fact . . . [that] has a legitimate and effective bearing on the decision of the case and is in dispute.' [Citation omitted.]" *Reid*, 286 Kan. at 505. Evidence is probative if it has " 'any tendency to prove any material fact.' " *State v. Houston*, 289 Kan. 252, 261, 213 P.3d 728 (2009) (quoting K.S.A. 60-401[b]).

Thus, the question Gilliland raises is whether the trial court applied the correct test of determining whether C.E.'s prior behavior was material and probative and, therefore, relevant. The focus of this inquiry is on the following statements by the judge:

"I'm finding it real difficult to understand—to find in this case that the rape shield should be penetrated. If this were an uncorroborated allegation by the victim herself, perhaps at least limited evidence with regard to the prior unfounded allegation might be relevant, but I think it's an awfully large jump from testimony of her being [a] clingy, and not only with men but with women, child [who was] obviously . . . raised in an extremely dysfunctional household[. It] doesn't seem to be relevant to the issues in this case where . . . there is direct corroboration of the incident itself and I think it would be unduly intrusive to the victim and not in violation of any of the defendant's due process rights to enforce the rape shield in this act [*sic*]. The Court would, at least in the present context, deny the defense's motion under 21-3525 and prohibit the introduction of any prior sexual conduct attributed to the victim."

There is no mention of whether the evidence was material or probative in these conclusions. And, as Gilliland argues, when the

court mentioned relevance it was tied to corroboration. According to the trial court, if the evidence had been uncorroborated it would have been relevant and because it was corroborated it was not relevant. Yet, relevance is not determined by corroboration or the lack thereof. The trial court tied two unrelated concepts together and, in doing so, failed to apply the correct standard.

Nevertheless, an "appellate court shall disregard all mere technical errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining, where it appears upon the whole record that substantial justice has been done by the judgment." K.S.A. 60-2105; see K.S.A. 60-261 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). To determine if substantial justice has been done an appellate court must determine whether the error affected

"the outcome of the trial in light of the entire record. The degree of certainty by which the court must be persuaded that the error did not affect the outcome will vary depending on whether the fundamental failure infringes upon a right guaranteed by the United States Constitution. If it does not, the trial court should apply K.S.A. 60-261 and determine if there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record. If the fundamental failure does infringe upon a right guaranteed by the United States Constitution, the trial court should apply the constitutional harmless error analysis defined in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), in which case the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict. . . . An appellate court reviewing the second step for an injustice will review the entire record and use the same analysis, applying K.S.A. 60-261 and K.S.A. 60-2105 or else *Chapman*, depending on the nature of the right allegedly affected." *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Gilliland argues the *Chapman* harmless error standard applies because he was denied his constitutional right to present a defense. We disagree, even though the State does not dispute his assertion. The reason we do so is because Gilliland was able to present his defense. Evidence in support of the defense was presented through

the testimony of Gilliland; Charlotte; Fletcher; Andrew Massey, a physician who evaluated Gilliland in 2006 regarding his epilepsy; Dr. Logan, as his expert witness; and others. Gilliland was only limited by the exclusion of some evidence relating to this defense, and that evidence was excluded based on an evidentiary ruling under the rape shield statute. " '[T]he right to present a defense is subject to statutory rules and case law interpretation of the rules of evidence and procedure.' [Citation omitted.]" *Houston,* 289 Kan. at 261. And, when the issue relates to the application of a rule of evidence or procedure and not to a complete denial of a defense, we conclude the harmless error standard of K.S.A. 60-2105 and K.S.A. 60-261 applies, rather than the *Chapman* constitutional standard.

Under the harmless error standard of K.S.A. 60-2105 and K.S.A. 60-261, we must determine if there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *Ward,* 292 Kan. at 569-70; see *State v. McCullough,* 293 Kan. 970, 981-82, 270 P.3d 1142 (2012). The State, as the party seeking the exclusion of the evidence and therefore as the party presumably benefitting from the error, has the burden of persuading us that the error was harmless. *McCullough,* 293 Kan. at 983.

In applying this standard, we are first faced with the question of whether the evidence would have been admissible if the trial court had applied the correct standard. As an appellate court we are hampered in this assessment because our typical role is to determine if the trial court abused its discretion in determining whether evidence is probative. *Reid,* 286 Kan. at 509. Without any findings of fact or conclusions of law to review, we would have to make a de novo review of probativeness, which is outside the role of an appellate court. Rather than step outside our role, we will assume, without determining probativeness, that the evidence was admissible and assess whether there is a reasonable probability that the outcome of the trial would have been different if the evidence had been admitted.

In making this determination, it is important to place the evidence in its legal context. Legally, the evidence has little bearing. Even if C.E. had climbed on Gilliland and begged for the sexual

contact, her consent—as a child younger that 14—has no legal bearing on guilt. Gilliland had to establish that he was unconscious and presumably incapable of participating in the charged offense; in other words, he was incapable of having oral contact with C.E.'s female genitalia. See K.S.A. 21-3501(2) (defining sodomy); K.S.A. 21-3506 (aggravated sodomy). In other words, the jury would have had to believe that C.E. chose to sit on an unconscious person's mouth—Charlotte admitted at trial that she saw Gilliland's mouth "line[d] up [with C.E.'s genitalia], but I mean, I can't say anything was moving or anything like that." Further, the jury would have had to conclude Gilliland did not react in anyway and that it took Charlotte pulling on his hair to bring him to consciousness.

Gilliland argues the evidence of C.E.'s past behaviors would have made all of these conclusions more plausible because the jury would have believed C.E. climbed on his face of her own volition. Gilliland's argument ignores his confession to Fontanez that he was having "[o]ral sex" with a 12 year old. This contemporaneous admission and showing of awareness regarding what had occurred causes us to conclude it is more likely than not a jury would have found Gilliland's defense implausible even if the evidence of C.E.'s prior behaviors had been introduced. This is especially true in light of other evidence in the record. In particular, Charlotte made contemporaneous statements to Fletcher, which Fletcher repeated to Fontanez, telling him that Charlotte had said Gilliland had "oral sex" with C.E.

In making these contemporaneous reports of the crime, Charlotte and Fletcher did not report to any law enforcement officer that they were concerned that Gilliland had suffered a seizure or that he seemed unaware of what was going on. And the officers did not observe any behavior that made them draw this conclusion. Gilliland never made such a suggestion to the interviewing officers. And, although C.E. had previously observed Gilliland during a seizure, when asked if it looked to her like Gilliland was having a seizure on the day of the incident, she replied, "No." When asked if he was sleeping, C.E. replied, "No." C.E.'s statements, at least in all major respects, remained consistent throughout the interview and various court proceedings. Although she was never very forth-

coming with details, at trial she testified clearly to feeling Gilliland's tongue, not just his mouth, on her genitals.

In light of the record as a whole, the exclusion of the evidence regarding C.E.'s past behavior was harmless. Even if the jury had heard the evidence and had believed C.E. was so troubled she would have invited the contact, there is not a reasonable probability the outcome of the trial would have been different.

## ISSUE 4: PRETRIAL TAINT HEARING REGARDING C.E.'S STATEMENTS

Next, Gilliland argues the trial court erred in denying his motion to hold a pretrial taint hearing to determine the reliability of C.E.'s trial testimony and statements to law enforcement officers due to allegedly suggestive interviewing techniques. This issue requires some explanation of what occurred before trial.

Gilliland filed a motion to exclude the testimony of C.E. from the trial and to suppress her statements to officers. Gilliland questioned C.E.'s competency and argued that many of the interviewing techniques used by investigators were "prone to produce misleading and unreliable information" from C.E. In support of his motion, Gilliland stated that the officers' decisions to provide C.E. with a description of her mother's observations of the incident, together with the "leading and suggestive interrogation" techniques, C.E.'s mental "limitations," and the officers' "questioning of negative or exculpatory responses and reinforcement of inculpatory responses," rendered C.E.'s statements involuntary, tainted, and unreliable.

At the pretrial motions hearing, the trial court heard extensive testimony pertaining to C.E.'s previous sexual conduct and her competency. In regard to C.E.'s statements, the court heard the testimony of the two interviewing officers and C.E. In addition, the court listened to the audio recording of C.E.'s interview.

Despite this evidentiary hearing, Gilliland insisted the trial court should conduct a separate, designated pretrial taint hearing on whether C.E.'s statements to officers were unreliable and, therefore, inadmissible due to the officers' interviewing techniques. Gilliland indicated he would present the testimony of Dr. Kathie

Nichols, a licensed clinical psychologist, on the issue of taint due to police interviewing techniques, including her criticism of the "Finding Words" protocol used by the officers in this case. The judge refused, stating:

"[I]f you're asking me to rule on the interview techniques, I didn't hear anything inappropriate from the officers yesterday or listening to the tape. The Finding Words is a tool, it's not carved in stone, it's not a formula, it's just something—it's just . . . training for the interviewers but I mean there's no statutory require-ment or due process requirement that they have to follow Finding Words to the letter. I mean you yourself introduced or referred to a notebook about six inches thick and I'm quite sure that every word in that notebook is not followed in every interview by every interviewer. Every interview is different, every person is dif-ferent and I didn't find anything unduly suggestive or unduly leading. In fact the victim witness was quite ready to disagree with the . . . interviewers.

. . . .

"[I]f there's some question as to the victim's ability to communicate and that sort of thing, that can be raised by appropriate cross-examining of the defense at the trial, but the victim is competent to testify, she clearly and consistently testified and is able to communicate to the jury . . . .

. . . .

". . . If the witness' testimony is subject to cross-examination, subject to ques-tioning, that's the purpose of a trial, not of some pretrial hearing."

Gilliland argues the trial court's limitations—refusing to hear the testimony of Dr. Nichols and refusing to otherwise hold a pretrial taint hearing on the alleged suggestive nature of the officers' in-terviewing techniques—violated his due process rights.

Although we generally review motions to suppress under a bi-furcated standard of review, reviewing the factual underpinnings of the trial court's decision under a substantial competent evidence standard and reviewing the ultimate legal conclusion drawn from those facts under a de novo review, the underlying due process question here is solely one of law that we review de novo. See *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010); *State v. Hall*, 287 Kan. 139, 143, 195 P.3d 220 (2008).

This issue appears to be one of first impression in that Kansas does not formally recognize pretrial taint hearings. One state—New Jersey—does, and Gilliland relies on the New Jersey case adopting the procedure, *State v. Michaels*, 136 N.J. 299, 642 A.2d 1372 (1994), to support his contention. Gilliland also cited this case

to the trial court, which refused to adopt it because it was not binding precedent in Kansas.

In *Michaels*, the New Jersey Supreme Court held that the trial court should have held a pretrial taint hearing concerning the admission of the child victims' statements and testimony after the defendant showed " 'some evidence' " that the victims' statements were the result of suggestive or coercive interviewing techniques. *Michaels*, 136 N.J. at 320. In such circumstances, the burden then shifts to the State to prove the reliability of the proffered statements and testimony by clear and convincing evidence. *Michaels*, 136 N.J. at 321. If the trial court determines that a child's statements or testimony do retain sufficient reliability for admission at trial under factors the court defined, then the jury must determine the probative worth and assign the weight to be given to such statements or testimony as part of their credibility assessment. *Michaels*, 136 N.J. at 323.

The *Michaels* court acknowledged that "assessing reliability as a predicate to the admission of in-court testimony is a somewhat extraordinary step." *Michaels*, 136 N.J. at 316. But it likened this situation to those involving the pretrial determination of the admissibility of eyewitness identification testimony, see *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), or those involving the pretrial determination of the voluntariness and admissibility of a defendant's statements to officers, see *Jackson v. Denno*, 378 U.S. 368, 377-78, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The *Michaels* court stressed that the effects of suggestive pretrial identification procedures, as with suggestive or coercive interview practices, are "exceedingly difficult to overcome at trial." *Michaels*, 136 N.J. at 319. "Competent and reliable evidence remains at the foundation of a fair trial, which seeks ultimately to determine the truth about criminal culpability. If crucial inculpatory evidence is alleged to have been derived from unreliable sources due process interests are at risk. [Citation omitted.]" *Michaels*, 136 N.J. at 316.

The judge in the present case, while rejecting the request for a separate hearing, made the ultimate finding mandated by the holding in *Michaels*, stating, "I didn't find anything unduly suggestive

or unduly leading. In fact the victim witness was quite ready to disagree with the . . . interviewers." Because the court made this finding, we decline to issue an advisory opinion on the question of whether a trial court *must* take on a gate-keeping role and determine reliability before allowing a child's statement to be presented to a jury, and our discussion of the issue should not be read to imply that outcome. (We note this question is controversial; a majority of jurisdictions have rejected the holding in *Michaels*. See, e.g., *State v. Karelas*, 28 So. 3d 913, 915 [Fla. Dist. App. 2010] ["Like the majority of jurisdictions that have considered *Michaels*, we reject its conclusion."]). Rather, the limited question that we will resolve is whether the trial court erred by not conducting a separate hearing and by not allowing Gilliland to present an expert's testimony before ruling C.E.'s interview was not unduly suggestive.

Regarding the need for a separate hearing, we conclude the trial court did not err in determining the issue in the context of the competency hearing, especially after the court had heard evidence regarding C.E.'s statements and had an opportunity to view a video recording of the statements. Few, if any, jurisdictions other than New Jersey have strictly imposed a procedural requirement for a separate taint hearing. In fact, some courts have rejected the idea of a separate pretrial taint hearing even though they have followed the *Michaels* lead and found the idea of taint relevant in a pretrial assessment of the admissibility of the proffered testimony of a child witness. These courts have permitted an inquiry into suggestiveness through the use of competency hearings, as was done here. See *Com. v. Delbridge*, 578 Pa. 641, 664, 855 A.2d 27 (2003) ("[A] competency hearing is the appropriate venue to explore allegations of taint."); *Dependency of A.E.P.*, 135 Wash. 2d 208, 230, 956 P.2d 297 (1998) ("We decline to adopt a pretrial taint hearing as a requirement for the reason that the existing state of the law adequately addresses Petitioner's concerns. As to the reliability of a child's testimony, a defendant can argue memory taint at the time of the child's competency hearing."); *English v. State*, 982 P.2d 139, 146 (Wyo. 1999) ("While we agree with the reasoning of the

New Jersey Supreme Court, we conclude that there is no void in Wyoming law which a 'taint hearing' procedure would fill.").

The main reason Gilliland argues for a taint proceeding is to separate the competency finding from a reliability finding. Granted, in this case, the trial court moved between the two concepts and ultimately based the ruling on competency. But the court explicitly found the interview was not unduly suggestive or unduly leading. The court also noted that C.E. pushed back when she disagreed with the interviewer. Further, Kansas law grants the necessary discretion to consider whether a witness is incapable of telling the truth because of outside influences, such as a suggestive interrogation. See K.S.A. 60-408 (granting trial court discretion in conducting proceedings to determine if witness is qualified); see also K.S.A. 60-417 (witness is disqualified "if the judge finds that [a] the proposed witness is incapable of expressing himself or herself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him or her, or [b] the proposed witness is incapable of understanding the duty of a witness to tell the truth").

The other reason Gilliland seeks a separate hearing is intertwined with his attempt to present his expert's testimony. He does not present any authority suggesting that a trial court would not have discretion during a *Michaels* hearing to determine whether specific witnesses would be allowed to testify. Moreover, Gilliland does not establish any harm. The court's comments indicate a familiarity with the Finding Words protocol, and a notebook of information was admitted. The court invited the defense to present evidence at trial. Gilliland decided not to and did not to make a proffer so that an appellate court could determine the evidence that might have been submitted. Without this proffer, we cannot assess whether the expert's testimony probably would have changed the trial court's ruling.

In light of the record before us, we conclude the trial court did not err in denying the motion for a separate taint hearing or in denying the defense's request to present Dr. Nichols' testimony during the competency hearing. Gilliland's due process argument fails.

## ISSUE 5: *ALLEN*-TYPE JURY INSTRUCTION

Next, Gilliland argues that the trial court committed reversible error when it gave a "deadlocked jury" instruction, or *Allen*-type charge, before deliberations began, indicating that "[a]nother trial would be a burden on both sides." See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). Gilliland admits he did not object to the instruction and that the clearly erroneous standard of review applies as a result. See K.S.A. 22-3414(3). Nevertheless, he argues the trial court clearly erred in giving the instruction in light of our disapproval of this language in *State v. Salts*, 288 Kan. 263, 265-66, 200 P.3d 464 (2009), which was decided 1 month after the trial in this case.

Subsequent to *Salts*, this court has consistently confirmed its holding, which means that the instruction in this case was erroneous. Yet, in numerous cases applying this holding, we have concluded giving the instruction with the challenged language was not clear error. See, *e.g.*, *State v. Burnett*, 293 Kan. 840, 855, 270 P.3d 1115 (2012); *State v. Washington*, 293 Kan. 732, 740-42, 268 P.3d 475 (2012) (listing cases). Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *Salts*, 288 Kan. at 265-66.

In attempting to distinguish the long list of post-*Salts* cases, Gilliland argues the jury in his case could have been misled because the evidence against him was not overwhelming. Specifically, he points to testimony about his seizure disorder and the increased frequency of those seizures during alcohol use and testimony by Charlotte indicating that Gilliland appeared to be "out" when she walked in on the incident in the living room.

This argument does not address how the misleading nature of the instruction might have made a difference in the jury's deliberations; nothing in the record demonstrates the jury was near deadlock, deadlocked, pressured to reach a verdict, or concerned about the implications of another trial. Moreover, as we discussed in determining the harmlessness of the error to exclude evidence of C.E.'s prior sexual behavior, there was substantial evidence of

guilt presented to the jury. Under these circumstances, we conclude there is no real possibility that the jury would have rendered a different verdict if the offending wording had been omitted from the jury instructions.

### ISSUE 6: CUMULATIVE ERRORS

Next, Gilliland unpersuasively argues that even if one of the trial court's errors alone does not require reversal, then the cumulative effect of the errors denied him a fair trial, requiring reversal.

"In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless. [Citation omitted.] In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial?" *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

Where, as here, the errors found by this court are not constitutional in nature, we examine whether there is a reasonable probability the aggregated errors would have affected the outcome of the trial. *Ward*, 292 Kan. at 569-70. In making the assessment of whether the cumulative errors are harmless, an appellate court examines the errors in the context of the record as a whole considering how the trial court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. See *Tully*, 293 Kan. at 205-06; *Ward*, 292 Kan. at 569-70.

In this appeal, we have found two errors: (1) The trial court applied the wrong standard in determining if evidence within the ambit of the rape shield statute was inadmissible and (2) the trial court erred in giving an erroneously worded *Allen*-type jury instruction. These errors were unrelated and unlikely to have impacted one another. See *State v. Martinez*, 290 Kan. 992, 1017, 236 P.3d 481 (2010) (two trial errors were harmless, unrelated, and were not, in combination, so prejudicial as to deny the defendant a fair trial). And, as we have already stated, we find nothing in the record to suggest the *Allen*-type instructional error had any impact.

Even factoring in the potential of some impact, we do not believe that potential changes the harmless error analysis we conducted as part of our discussion of the error regarding the rape shield statute.

Consequently, we conclude the cumulative errors were harmless and did not have an effect on the jury's verdict.

### ISSUE 7: DEPARTURE SENTENCE

Gilliland also attacks his sentence on several grounds, including an argument that the sentencing court erred in denying his motion for departure. The record regarding whether the court departed and the reasons for the departure are very confusing. The sentencing court stated it was denying the motion to depart, and both parties take that position in their appellate briefs. But the court did not impose the statutorily defined sentence. Rather, the court departed from the life sentence to be imposed under Jessica's Law, K.S.A. 21-4643, and imposed a sentence under the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.*, of 586-months' incarceration.

As we held in *State v. Jolly*, 291 Kan. 842, 846-47, 249 P.3d (2011), a sentencing court departs from Jessica's Law if it does not impose a life sentence. If a different sentence is imposed, the sentencing court must state the substantial and compelling reasons for departure and must depart to the applicable KSGA grid box. Once the sentence becomes a guidelines sentence, the court is free to depart from the sentencing grid. However, departure findings must justify both steps. "[T]he requirements of neither the first step into the guidelines nor the second step away from the presumptive guidelines sentence can be ignored, and all departure procedures must be followed. [Citation omitted.]" *Jolly*, 291 Kan. at 847. Those requirements and procedures were not followed here.

In the appellate briefs filed in this case, neither party mentioned the departure from the life sentence. At the oral argument, when members of the court asked for help in understanding the record, the State suggested the sentencing court had meant that Gilliland had a life sentence but must serve 586 months of his sentence before he would be eligible for parole. See K.S.A. 21-4643(a)(2)(B) (minimum mandatory sentence under Jessica's Law is 25 years un-

less the defendant's guidelines sentence would be longer than 25 years, in which case the minimum sentence is equal to the guidelines sentence). But the court's statements and the journal entry are not consistent with this suggestion.

This leaves us in an unusual situation. The State did not object to the sentencing court's procedure and did not cross-appeal and argue there was a departure without accompanied findings. Yet, we cannot sensibly talk about Gilliland's contention that the sentencing court erred when it failed to grant a departure motion when, in effect, it appears the court departed. We conclude under these unusual circumstances—where the sentence is ambiguous because it is contrary to the law and to the explicit finding of the sentencing court—we must vacate the illegal sentence and remand for resentencing. See *State v. Anthony*, 273 Kan. 726, 730, 45 P.3d 852 (2002) (finding appellate court has authority pursuant to K.S.A. 22-3504 to *sua sponte* correct an illegal sentence and remand for imposition of corrected sentence).

### Issues 8 to 10: Other Sentencing Issues

In addition, Gilliland argues his sentence is cruel and unusual punishment, a no-contact order was illegal, and his constitutional right to trial was violated by the reliance on his prior criminal history at sentencing without a jury finding. Because we have ordered a remand for resentencing and the basis for these claims of error may not apply under the new sentence, we do not address these questions as they are no longer ripe.

In conclusion, we affirm Gilliland's aggravated criminal sodomy conviction, vacate his sentence, and remand for resentencing.

Conviction affirmed, sentence vacated, and case remanded with directions.