IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,537

STATE OF KANSAS,
*Appellee*,

v.

BILLY F. DAVIS, JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

On the record in this case, the State's circumstantial evidence of premeditation underlying the defendant's conviction for capital murder was sufficient.

2.

A prosecutor's statement to a jury that "you don't spend the rest of your life in prison unless you've killed" is a misstatement of Kansas law. In this case, the prosecutor also committed error by telling the jury that there was "not one piece of evidence that says that the defendant was either drinking or using drugs" after midnight. A witness had testified that he saw the defendant use cocaine at 2:45 a.m. These prosecutorial errors are not individually or cumulatively reversible, given the strength of the evidence against the defendant.

3.

The district court judge in this case correctly denied the defendant's motion to suppress his statement to police officers as involuntary.

4.

It is not error for a judge to refuse to add repetitive language to jury instructions.

5.

When a rape has been used to support a conviction of capital murder under K.S.A. 2011 Supp. 21-5401(a)(4), a second conviction for the same rape is multiplicitous and must be reversed.

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed May 19, 2017. Affirmed in part and reversed in part.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jodi E. Litfin*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.:  This is the direct appeal of defendant Billy F. Davis, Jr., from his convictions arising out of the March 2012 death of 8-year-old A.I. in Topeka.

Davis challenges:  (1) the sufficiency of the evidence to prove premeditation, (2) alleged prosecutorial error in closing argument, (3) the denial of his motion to suppress his confession, (4) the rejection of jury unanimity language in instructions, and (5) the multiplicity of his rape conviction.

We affirm the district court's judgment with the exception of Davis' rape conviction, which we reverse. Rape is, in essence, an element of Davis' conviction for

capital murder, which means he is punished for it to the extent the capital conviction stands.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 12, 2012, Alysia Majette had multiple guests at her home: Kanesha Mock; Takeisha Williams; Melinda Weeden; Angela Ortega; and three of Ortega's children, 18-year-old Briana Ortega, R.I., and 8-year-old A.I. Two others stopped by briefly after dinner, defendant Davis and his then-girlfriend, Sandra Adams. They were looking for Weeden, who was Adams' long-time friend.

Around 11 p.m. everyone at Majette's home went to bed. Mock and Ortega's children slept in the living room on couches and air mattresses. The rest of the women slept in upstairs bedrooms. Someone locked the front door.

About 2:30 a.m., Mock heard someone trying to open the front door of Majette's apartment. She woke Briana, and they looked through the peephole in the door. They saw nothing.

Mock eventually fell asleep again about 4 a.m., but she was awakened by the sound of the front door being opened. She saw a man walking out the front door, carrying A.I. like a baby. She woke Briana again and told her that she saw A.I.'s "hair go out the door." Briana went upstairs while Mock looked out the front door. Mock saw nothing. When Briana came back downstairs, Mock told her that a man had taken A.I., and everyone immediately began searching for A.I.

Weeden called the Topeka police department's non-emergency number about 30 minutes later.

Ortega went to the apartment of neighbor Alyssa Giancana to look for A.I., because her children sometimes played with Giancana's children. Ortega saw Davis in the front doorway and asked if he had seen A.I. Davis said that no one was there and slammed the door.

Mock and Majette encountered DaShawn Hughes, who was leaving Giancana's apartment. Majette would later testify that Hughes told her to check Giancana's apartment for A.I. because there was a man there who was acting strangely.

Williams and Briana went to Giancana's back door. They knocked, saw lights flicker, and heard a bang. Davis answered the door, told them that no one else was there, denied seeing A.I., and slammed the door. Williams would later testify that after she had taken about 20 steps away from the apartment she heard a scream but thought it came from Ortega. Briana would later testify that she had heard the scream and thought it had come from Giancana's basement.

Officers began arriving about 5:25 a.m. One officer escorted Majette to the back door of Giancana's apartment. Majette would later testify that she saw lights flickering inside and saw a short man peeking out as she knocked on the door. The man—whom she assumed to be Davis—did not open the door.

The women asked officers to check Giancana's apartment, so the officers returned there. Davis answered the door and allowed officers to search. Shortly after entering the apartment, an officer found A.I.'s body in the clothes dryer in the basement of the apartment. Although A.I. was still warm to the touch when officers found her, she was not breathing and her pupils were fixed and dilated. She was rushed to a hospital but

4

could not be revived. She was declared dead at 6:31 a.m., approximately 2 hours after she had been taken from Majette's apartment.

Davis overheard a police radio alert that A.I. had been found and fled from Giancana's apartment.

In the course of investigation, police would eventually learn that two other area apartments had been burglarized the same night. It was also discovered that Davis had tried to get into a nearby school after fleeing. He was denied access by the school's secretary, who had a brief conversation with him.

Officers apprehended Davis within a few hours and took him to the police station. He was put in an interrogation room at 11:15 a.m. He was wet, barefoot, and cold. Sergeant Bryan Wheeles removed Davis' handcuffs and gave Davis a soda, a sandwich, a blanket, and a restroom break.

Detective Scott Dickey would later testify that he began Davis' interrogation at 12:40 p.m. Dickey read Davis his *Miranda* rights, and Davis agreed to speak.

Davis told Dickey and Wheeles that he had drunk a large amount of alcohol and had consumed cocaine the day before, but Dickey and Wheeles would later testify that they saw no signs of intoxication during the interrogation. Dickey also would testify that Davis did not hesitate or express a desire not to cooperate. Wheeles would testify that there was no force, coercion, or duress during the interrogation.

Davis said he had his GED and was a disabled veteran who suffered from severe post-traumatic stress disorder. He also said he had suffered a head injury when an improvised explosive device blew up during his service in Iraq.

5

During the interrogation, Davis was given two more drinks and the cigarettes of his choice. He was allowed multiple smoking breaks.

Davis confessed to breaking into three different apartments:  The first apartment would later be identified as leased to Jasmine Walker; the second apartment would later be identified as leased to Manola Paez; the third apartment was Majette's, where Davis admitted to kidnapping A.I. Davis confessed that he beat, choked, and raped A.I., before putting her into the clothes dryer. He denied that he intended to kill her and appeared to be surprised when Dickey told him that A.I. was dead. When Dickey stepped out of the interrogation room, Davis turned a displayed photograph of A.I. face down.

The State charged Davis with 10 counts, among them 2 alternative counts of capital murder based on either the rape or the kidnapping of A.I.; an alternative count of premeditated first-degree murder; and rape.

Davis filed a motion to suppress his statements to police, arguing that he did not understand his rights or the consequence of waiving them. He also claimed that his statements were not made voluntarily because of his alcohol and drug use and his mental disorders. The district judge denied the motion after a hearing.

At trial the State presented the testimony of multiple law enforcement officers involved in the case, including Topeka Police Department Officers Michael Ahlstedt and Jared Strathman, who had gone to Giancana's apartment.

Strathman testified that he heard a loud bang—like the sound of metal on metal—when he knocked on Giancana's door. He then heard a voice saying "hello," and Davis opened the door.

Strathman said that Davis told the officers he had not seen A.I. and allowed them to come inside to look for her. The officers first searched the second floor of Giancana's apartment, where they found Giancana's son and Giancana's friend Eric Chappell asleep. Davis began pacing as the officers returned to the apartment's main level. Davis told Stratham he was drunk, and Strathman could smell a faint odor of alcohol on Davis; but Strathman thought that Davis appeared nervous.

While Strathman remained on the main level, Ahlstedt went downstairs to search the basement. Ahlstedt did not turn on the basement light and used his flashlight to search. When he saw blood he initially dismissed it, because it was close to an empty meat tray. Then, as Ahlstedt started back up the stairs, he noticed a washer and dryer. He decided to look inside them. When he opened the dryer door and found A.I., he initially thought she was hiding. But it quickly became apparent that A.I. was not responsive, and Ahlstedt removed her from the dryer and began performing CPR.

Ahlstedt used his police radio to inform other officers that he had found A.I. Strathman, still on the main level with Davis, heard Ahlstedt and went down to the basement to assist. When Strathman returned to the main level, he noticed that Davis was gone.

Dickey testified over objection at trial about Davis' confession.

Also at trial, Adams testified that she and Davis had spent the day before A.I.'s death at Giancana's apartment, where they drank half of a bottle of vodka and used "quite a bit" of cocaine before 4 p.m. Adams testified that she did not believe Davis was drunk or high when she left Giancana's apartment about 10 p.m.

7

Chappell testified that he had arrived at Giancana's about 7 p.m. He was watching Giancana's 2-year-old son while Giancana worked. According to Chappell, Davis was acting strange, pacing, and drinking a lot. He saw Davis "sniff" something shortly after 9 p.m. and testified that Davis was mumbling. More than once, Chappell said, Davis mentioned his desire to "look for girls" and asked Chappell to walk around the apartment complex with him, a request Chappell declined. Chappell thought Davis was drunk or under the influence of drugs. Chappell went upstairs to bed about 10 p.m., where he remained until he was awakened by the police early the next morning.

Giancana came home about 2 a.m. for her lunch break. She spoke to Davis, who said he wanted to have sex with a girl who looked like Giancana. Giancana said that Davis did not appear drunk.

Hughes went to Giancana's apartment about 2:45 a.m. He said Davis was there and acting strange, "moving suspiciously," and acting high. Hughes also testified that he saw Davis use cocaine. Hughes then spent time upstairs with Chappell. He did not see A.I., but he heard a scream while descending the stairs from the second floor and saw Davis "slapping" something. When Hughes left the apartment through the front door, he ran into Majette. Majette asked him if he had seen A.I., and he suggested that she check at Giancana's apartment because "the dude's acting kind of suspicious and weird."

An investigating detective who had interviewed Hughes testified that Hughes told him he heard a child's scream and saw Davis slap someone just before Hughes left Giancana's.

Walker, a neighbor of Majette and Giancana, testified that she had not been home when A.I. was taken. When she returned home later that morning, she discovered that her

8

back door had been kicked in. Nothing was missing from her apartment. She had not given anyone permission to enter.

Paez, another neighbor, told jurors that shortly before 4 a.m. he was awakened by his daughter's bedroom door being opened. He saw the silhouette of an unfamiliar man in the doorway. When confronted, the man fled. Paez had not given anyone permission to enter his apartment. A large kitchen knife was missing after the incident.

The secretary of the school Davis had tried to enter testified that he did not appear drunk.

The State also introduced Davis' videotaped confession over objection at trial.

The videotape included Davis' statement that his military training and experience had made "killing . . . first nature for [him]." The jurors also saw Davis admit that he broke into three apartments, including Majette's, where he saw A.I. sleeping, watched her for a moment, then picked her up and took her back to Giancana's apartment. He admitted that, once back at Giancana's, he took A.I. down to the basement.

Davis said he punched A.I. in the face twice after she made noise, which briefly quieted A.I., but then she screamed. Davis said he then realized that he had gone "too far," so he did "the only thing [he] knew" and "choked her." He admitted to using a "rear-naked chokehold" on A.I., which cut circulation in A.I.'s jugular vein. Davis admitted that the rear-naked chokehold could be lethal.

Davis also admitted on the videotape that he inserted his finger into A.I.'s vagina. He denied inserting anything into her anus. He could not remember whether he penetrated A.I. with his penis.

9

Davis said during his interrogation that A.I. was snoring when he wrapped her in a blanket. He put A.I. in the dryer when police officers arrived. Davis said he was "shooting the breeze" with the police officers who came into the apartment so that they would not suspect anything.

Without solicitation from the investigators, and before he was told that A.I. was dead, Davis said on the videotape: "I guess I'll be spending the rest of my life in prison. Fucking great." When Dickey later told Davis that A.I. was dead, Davis appeared to be surprised.

The medical examiner who performed A.I.'s autopsy testified at trial that she had hemorrhages in both eyes consistent with either strangulation or repeated blows to the head; one of her teeth had been ripped out; she had suffered blows to her head and face; and she had bruising to her voicebox and the inside of her mouth, consistent with a hand being held over her mouth. The medical examiner also observed tearing around A.I.'s perianal region, bruising to the front of her genitalia, and internal injuries. He concluded that A.I. died from asphyxiation, which could have been caused by strangulation or by positional asphyxiation. The medical examiner was unable to identify the exact cause of A.I.'s death because there were "multiple components" that factored into it: She had been punched in the head; her mouth was covered; she had been strangled; and her position in the dryer could have obstructed her airway. The medical examiner also testified that the chokehold could have rendered A.I. unconscious in 12 to 15 seconds, and death could have been instantaneous or could have taken up to 3 minutes, depending on which blood vessel was affected.

A sexual assault nurse examiner who examined A.I.'s body testified that she saw multiple injuries to A.I.'s genitalia, including swollen labia, "several" tears and

10

lacerations inside A.I.'s vaginal canal, and bruising or swelling on A.I.'s cervix. There was active bleeding on A.I.'s labia majora, which meant it was still oozing and had not clotted. When examining A.I.'s vagina, the nurse counted one "major tear" externally and three additional tears internally. Additionally, the nurse counted two tears on A.I.'s anus.

Defense counsel presented the testimony of an investigator with the death penalty defense unit and a forensic toxicologist who prepared the report of the results of the test. The investigator described taking a sample of Davis' hair on March 30—17 days after A.I.'s death—to send for testing. The toxicologist said lab staff tested the sample for a panel of eight drugs and found evidence of cocaine and alcohol use. Because Davis' defense team did not ask for segmented testing, the toxicologist could narrow the ingestion of the substances only to sometime in the preceding 8 months—July 2011 through March 2012. Davis did not testify.

During the initial jury instruction conference, Davis' counsel requested that "in some way [the judge] let the jury know, instruct the jury that they must be unanimous on either Count 1 [capital murder based on the rape of A.I.] or Count 2 [capital murder based on the kidnapping of A.I.]." His counsel also asked that the jury be instructed that "Count 1 is charged in the alternative to Count 2 and is charged in the alternative to Count 3 [first-degree murder]."

The judge denied the request. The judge did instruct the jury that arguments by counsel were not evidence. He also provided the following instruction orally and in writing:

> "Each crime charged against the defendant is a separate and distinct offense. You must
> decide each charge separately on the evidence and law applicable to it, uninfluenced by
> your decision as to any other charge. The defendant may be convicted or acquitted on any

11

or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the presiding juror."

After providing the elements instructions for each count, the judge told the jury that its "agreement upon a verdict must be unanimous."

During closing arguments, the prosecutor argued that the evidence contradicted Davis' claim that he did not know A.I. was dead until told by his interrogators. She said:

"Maybe just as important as any other evidence the defendant knew that [A.I.] was dead before he was told she was dead in that interview. Take the time to watch it. Verify everything that I'm telling you and here's what you'll find: The defendant says, you heard him say it, [']now I got to fucking spend the rest of my life in prison, fucking great.['] And you know when he said that. He said that before Detective Dickey told him that [A.I.] was dead. And you don't spend the rest of your life in prison unless you've killed."

During the rebuttal portion of her closing remarks, the prosecutor argued:

"[W]e've never said that [Davis] didn't use cocaine. But we are saying and the evidence shows that he stopped using both the night before. There's not one witness, there's not one piece of evidence that says that the defendant was either drinking or using drugs from midnight that took us to March 13th or after. It's not in the evidence."

The jury convicted Davis on all counts. It declined to impose the death penalty.

DISCUSSION

*Sufficiency of Evidence of Premeditation*

We recently reiterated our standard of review when the sufficiency of the evidence is challenged in a criminal case:

"[W]hether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Woods*, 301 Kan. 852, 874, 348 P.3d 583 (2015).

The jury convicted Davis on two alternative counts of capital murder for the intentional and premeditated killing of A.I.: causing her death during the commission of or subsequent to rape, K.S.A. 2011 Supp. 21-5401(a)(4); or causing A.I.'s death during the commission of a kidnapping, K.S.A. 2011 Supp. 21-5401(a)(7). The jury also convicted Davis on a third alternative count of first-degree murder: killing A.I. intentionally and with premeditation, K.S.A. 2011 Supp. 21-5402(a)(1).

Davis does not deny killing A.I., but he claims on this appeal that there was insufficient evidence that he killed A.I. intentionally or with premeditation.

"Premeditation means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act." *State v. Scaife*, 286 Kan. 614, Syl. ¶ 1, 186 P.3d 755 (2008). Premeditation can occur at any time during a violent episode that ultimately causes death. *State v. Appleby*, 289 Kan. 1017, 1059-60, 221 P.3d 525 (2009).

13

In support of his sufficiency argument, Davis asks us to focus on evidence he views favorably: the tone of surprise in his voice when Dickey told him A.I. was dead; the medical examiner's testimony that he could not specifically identify how A.I. was asphyxiated; injuries often found in strangulation cases that were not found on A.I.'s body, such as bruising to the neck and hyoid bone; and the short amount of time between A.I.'s disappearance and discovery. Davis contends that the evidence pointed to an accidental killing and was most consistent with him placing A.I. in the dryer alive, with the unintended position of her head and neck later causing her death. Relying on social science research, Davis also suggests that the jury found him guilty based not on the evidence but on the bias in favor of the prosecution that is an inevitable byproduct of death-penalty qualification.

Davis' first argument misses the mark. He must do more than direct us to evidence that favors his version of events; he needs to establish that the evidence supporting the State's theory was legally insufficient. See *State v. Verge*, 272 Kan. 501, 512, 34 P.3d 449 (2001) (evaluating evidence not appellate court's responsibility; when appellate court views evidence, it must do so in light most favorable to prosecution). Also, premeditation can be inferred from circumstantial evidence. *State v. Hollister*, 300 Kan. 458, 470, 329 P.3d 1220 (2014).

We have previously pointed to five particular circumstances that may assist a court evaluating proof of premeditation: "(1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *Hollister*, 300 Kan. at 470.

14

On the first circumstance, it is well settled "that death by strangulation presents strong evidence of premeditation." See *State v. Walker*, 304 Kan. 441, 446-47, 372 P.3d 1147 (2016) (listing cases); see also *State v. Brown*, 234 Kan. 969, 972-73, 676 P.2d 757 (1984) (evidence of premeditation sufficient when severely beaten victim was killed by strangulation).

On the second circumstance, we also do not see any evidence that A.I. provoked Davis. A slumbering child is a threat to no one. See *State v. Kettler*, 299 Kan. 448, 468, 325 P.3d 1075 (2014) (lack of evidence that victim enticed defendant belies finding of provocation). And A.I.'s age rendered her nearly helpless against a military-trained grown man. See *State v. Lloyd*, 299 Kan. 620, 635, 325 P.3d 1122 (2014) (victim's age—17 months—precluded a finding of provocation). Though Davis said that he punched and choked A.I. for making noise after he abducted her, this is not the type of provocation a court should rely upon when determining whether a defendant was provoked and "instantaneously formed the intent to kill." *State v. Louis*, 305 Kan. 453, 460, 384 P.3d 1 (2016). A kidnap or sexual assault victim's physical resistance is not license for further victimization.

On the third circumstance—Davis' conduct near the time of A.I.'s death—a reasonable jury could draw a fair inference that his acts, including the permanent silencing of A.I., were premeditated:

- Davis broke into two apartments before Majette's—the first one was empty and the second was occupied by Paez, an obstacle;
- Davis took nothing from either the first or second apartment except a large knife, which suggests robbery was not the motive for the break-in;
- In the third apartment, Davis found, watched, and then took A.I.;

15

- Davis encountered multiple people looking for A.I., but he denied seeing her;

- Davis' violence against A.I. escalated as his nonlethal criminal behavior continued and his efforts to keep her quiet failed;

- When police arrived, Davis attempted to conceal A.I. by placing her in the dryer, disregarding likely consequences; and

- When he heard that A.I. had been discovered, Davis fled.

On the fourth circumstance, the jury heard that Davis asked Chappell to walk around the apartment complex with him and mentioned more than once that he wanted to "look for girls." Giancana testified about Davis' declaration, shortly before A.I. disappeared, that he wanted to have sex with a girl who looked like Giancana.

Finally, the jury heard the medical examiner's testimony about the number and severity of the injuries A.I. suffered. On the fifth circumstance, Davis admitted to using a potentially lethal chokehold on her.

The evidence on these circumstances easily surpasses the threshold of sufficiency to support the jury's determination that Davis premeditated A.I.'s killing.

Davis' second argument on juror bias arising from death qualification is equally meritless, as it is limited to a premeditation sufficiency challenge. Our holding that a reasonable and unbiased juror had plenty before him or her to convict Davis logically extends to a juror who is already inclined to convict. Davis' attacks on the practice of death qualification during voir dire requires a different underlying legal argument as its vehicle.

*Prosecutorial Error*

In *State v. Sherman*, 305 Kan. 88, 109-11, 378 P.3d 1060 (2016), we announced a new framework for consideration of a criminal defendant's challenges to his or her convictions and sentences based on the behavior of prosecutors:

> "Appellate courts will continue to employ a two-step process to evaluate claims of prosecutorial error. These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* __ U.S. __, 132 S. Ct. 1594 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' *State v. Sprague*, 303 Kan. 418, 430, 362 P.3d 828 (2015)."

In *State v. Netherland*, 305 Kan. 167, 180, 379 P.3d 1117 (2016), we noted that there is a "distinction between prosecutorial conduct that is merely negligent or careless and prosecutorial conduct that is intentional or in some way malicious" and determined that either can lead to error if the "prosecutor has strayed outside the wide latitude allowed the State's lawyer when discussing the evidence."

17

Davis contends that the prosecutor in this case strayed outside the wide latitude allowed on two occasions during closing arguments, first by misstating the law and second by misstating the evidence. Davis did not object at trial to the comments, "but the same standard of review applies to a claim of prosecutorial error during closing argument regardless of whether the defendant raised a contemporaneous objection." *State v. Pribble*, 304 Kan. 824, 832, 375 P.3d 966 (2016).

A prosecutor "cross[es] the line by misstating the law." *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012). The court "must consider the prosecutor's challenged comments 'in the context in which they were made, not in isolation.' *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014)." *State v. Pribble*, 304 Kan. 824, 833-34, 375 P.3d 966 (2016). And such a misstatement denies the defendant a fair trial when "the facts are such that the jury could have been confused or misled by the statement." *State v. Hall*, 292 Kan. 841, 849, 257 P.3d 272 (2011).

Davis argues the prosecutor misstated the law when she argued to the jury:

"Maybe just as important as any other evidence the defendant knew that [A.I.] was dead before he was told she was dead in that interview. Take the time to watch it. Verify everything that I'm telling you and here's what you'll find: The defendant says, you heard him say it, [']now I got to fucking spend the rest of my life in prison, fucking great.['] And you know when he said that. He said that before Detective Dickey told him that [A.I.] was dead. And you don't spend the rest of your life in prison unless you've killed."

Kansas law punishes crimes other than murder with life sentences. See *State v. Herbel*, 296 Kan. 1101, 299 P.3d 292 (2013) (sex crimes against young children punishable by life in prison). The State asserts that that this is not common knowledge. Common knowledge or not, the prosecutor misstated Kansas law and injected error into Davis' trial when she told the jury that "you don't spend the rest of your life in prison

18

unless you've killed." If she meant to say, "Perhaps defendant was thinking that . . . ," she should have said so.

Davis contends that he suffered reversible prejudice from this prosecutorial error because intent was the only contested issue at trial. As our ruling above on sufficiency of the evidence on premeditation indicates, the jury heard far more than ample circumstantial evidence to support its finding of intentional and premeditated murder. The only contrary direct evidence that Davis did not intend to kill A.I. was his own denial of such an intent. The only contrary circumstantial evidence was the medical testimony about the possibility of positional asphyxiation and the lay witnesses' testimony about the relatively short period between the time of A.I.'s disappearance and the time the search for her led to the door of Giancana's apartment. Davis may have been surprised. Panic, rather than intention and premeditation, may have led him to hide A.I. in the dryer.

We are ultimately persuaded "beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record." See *Ward*, 292 Kan. 541, Syl. ¶ 6. The prosecutor's error-fueled insinuation that Davis' remark indicated guilt was, if anything, an exceedingly minor contributor to the weight of the evidence against him, even when we limit our consideration to the element of intent or premeditation. Once the jury heard Davis describe killing as "first nature" and knew his understanding of the potentially lethal effect of the chokehold he applied to A.I., any impact from this prosecutorial error was effectively neutralized.

Davis also argues the prosecutor erred by misstating the evidence. "Prosecutors enjoy wide latitude in crafting closing arguments . . .[, but] a prosecutor's arguments must remain consistent with the evidence." *Pribble*, 304 Kan. at 832. Davis points to the following passage of the prosecutor's rebuttal closing argument:

19

"[W]e've never said that [Davis] didn't use cocaine. But we are saying and the evidence shows that he stopped using [alcohol and cocaine] the night before. There's not one witness, there's not one piece of evidence that says that the defendant was either drinking or using drugs from midnight that took us to March 13th or after. It's not in the evidence."

Hughes testified that he saw Davis using cocaine sometime after 2:45 a.m. The prosecutor clearly misstated the evidence and erred in this way as well.

Davis argues that proof of his intoxication was critical to his defense and we must, therefore, reverse his convictions. We disagree. In cases involving the need for a voluntary intoxication jury instruction, we have held that simple consumption of drugs or alcohol is not enough to support the defense. *State v. Brown*, 258 Kan. 374, 386-87, 904 P.2d 985 (1995). Proof of impairment is also necessary. 258 Kan. at 386-87. A defendant's ability to recall the circumstances surrounding the charged crime and provide a coherent narrative of his or her conduct undercuts a claim of intoxication sufficient to warrant a jury instruction. *State v. Hernandez*, 292 Kan. 598, 606-07, 257 P.3d 767 (2011) (defendant's ability to recall his or her actions demonstrates faculties intact); *Brown*, 258 Kan. at 387.

Witnesses' observations of Davis' consumption and impairment during the night before and the morning of A.I.'s death vary. Adams and Chappell described Davis' heavy consumption and evident impairment before 10 p.m., but Adams did not think Davis remained impaired at that time. Giancana, who saw Davis at 2 a.m., did not think he was impaired. Hughes, as mentioned, saw Davis use cocaine less than an hour later and thought he acted high. Approximately 3 hours later, after A.I. had been kidnapped, beaten, sexually assaulted, choked, wrapped in a blanket, and placed in the dryer, one of the investigating officers smelled a faint order of alcohol when talking to Davis, who said he was drunk. But a short while later, after Davis had fled, the school secretary who

prevented him from entering the school building did not observe impairment. And a few hours later, Davis showed no signs of impairment during his interrogation. He recalled the circumstances surrounding the crimes and provided a coherent narrative.

The prosecutor's erroneous statement was a temporal one—she did not allege that there was no evidence of Davis' consumption or impairment. She misstated only Hughes' reference to the time Davis was last seen using. She was off by 2 hours and 45 minutes.

We are convinced beyond a reasonable doubt that this prosecutorial error does not require reversal. The jury had a great deal of evidence before it on Davis' consumption and impairment. The observations closest in time to the crimes came from one of the investigating officers and the school secretary; neither thought Davis was impaired, although he described himself to the officers as drunk. The prosecutor's mistake certainly did not assist the jury. But it did not prevent it from performing its function.

Finally, before leaving the subject of prosecutorial error, we address whether the two errors, harmless standing alone, combined to require reversal. We conclude they did not. Although Davis may view both as related to the critical issue of intent, neither goes directly to that point. The misstatement of the law was part of the prosecutor's effort to imply consciousness of A.I.'s death before she was put in the dryer, but a person who had committed the crimes that occurred up to that point would have had an incentive to conceal A.I. whether she was still living or already deceased. Impairment from alcohol and/or drug consumption certainly may affect a person's ability to form the intent necessary to commit a crime, but as we have already discussed, the other evidence of intent and premeditation was so strong and the testimony on Davis' condition so varied that we regard the prosecutor's temporal misstatement as relatively minor.

21

*Motion to Suppress*

Davis next takes aim at the denial of his motion to suppress his confession, focusing on the voluntariness of his statement. He argues that his history of mental disorders plus his alcohol consumption, drug use, and lack of sleep in the 24 hours preceding his interrogation rendered him incapable of making a voluntary statement.

Our standard of review for reviewing a district judge's decision on a motion to suppress is well known:

> "'An appellate court generally reviews a trial court's decision on a motion to suppress using a bifurcated standard. The trial court's findings are first reviewed to determine whether they are supported by substantial competent evidence. Appellate courts do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed de novo. If the material facts [underlying] a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is [one] of law over which an appellate court [exercises] unlimited review.' [Citations omitted.]" *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016).

"The prosecution bears the burden of proving that a confession is admissible by a preponderance of the evidence." *State v. Gilliland*, 294 Kan. 519, Syl. ¶ 3, 276 P.3d 165 (2012).

Here, the district court held a hearing to determine whether Davis' confession was voluntarily given. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). Davis does not challenge the judge's resulting factual findings. He challenges only the judge's legal conclusion on voluntariness to allow the jury to consider his confession.

"The primary consideration to be given to a criminal defendant's inculpatory statement is its voluntariness." *Swindler*, 296 Kan. at 678. And this court considers the totality of the circumstances when evaluating whether a confession was voluntary. *Swindler*, 296 Kan. at 678. A nonexclusive list of factors to be examined includes:

"(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. [Citations omitted.]

. . . .

"'"[T]hese factors are not to be weighed against one another . . . , with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." [Citations omitted.]'" *State v. Gilliland*, 294 Kan. 519, 528-29, 276 P.3d 165 (2012).

The district judge noted that during Davis' 3-hour interview, he was given food, drinks, cigarettes, and bathroom breaks; the interrogators observed no evidence of intoxication or psychological distress; Davis appeared to be aware of his surroundings; and there were no threats or other pressure applied, and no promises were made.

23

Davis' appellate challenge stresses intoxication, sleep deprivation, and mental health issues. Neither alcohol and drug consumption nor mental disorders automatically establish involuntariness; the court must consider all circumstances surrounding the giving of a statement to determine if intoxication or a mental health problem prevented the accused from voluntarily making a statement. See *State v. Bethel*, 275 Kan. 456, 476-77, 66 P.3d 840 (2003) (mental disorder); see also *Gilliland*, 294 Kan. at 529-31 (despite alleged intoxication, defendant able to recall "considerable detail"; no other signs of impairment; statement voluntarily given); *State v. Norris*, 244 Kan. 326, 334-35, 768 P.2d 296 (1989) (defendant's claim of intoxication, physical and psychological pressure not supported by evidence; statement voluntarily given).

We see no reason to reverse the district judge's ruling on voluntariness. It is well supported by the record and the law. Despite Davis' claim that he was too intoxicated to voluntarily confess, both Dickey and Wheeles testified that they saw no signs of impairment during the interview. Davis' ability to communicate coherently and effectively shows that he was not overcome by intoxication, sleep deprivation, or PTSD; and Davis does not otherwise allege that Dickey and Wheeles somehow took advantage of his mental state. See *State v. Mays*, 277 Kan. 359, 377, 85 P.3d 1208 (2004) (confession by 16-year-old voluntary despite juvenile's low intellect, poor reading ability; no evidence officers took advantage of accused's intellectual infirmities).

*Unanimity Language in Jury Instructions*

Davis next challenges the jury instructions.

When analyzing jury instruction issues, we follow a three-step process focused on:

"'(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

"Our first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step." *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015).

Because Davis requested that unanimity language be added to the instruction on several counts, he preserved this issue for appeal. We therefore must determine whether omitting the language was error and, if so, whether the error was harmless. See K.S.A. 2016 Supp. 60-261 (court must disregard errors not affecting party's substantial rights); *State v. Kleypas*, 305 Kan. 224, 302, 382 P.3d 373 (2016) (court applies harmless error test when party requests, court refuses instruction).

Ordinarily, to determine whether there was error, we consider whether the language was legally and factually appropriate. See *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 (2015). When analyzing whether the instruction was factually appropriate, we "'should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction.'" *State v. Brownlee*, 302 Kan. 491, 511, 354 P.3d 525 (2015) (quoting *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]). We "'should use an unlimited review to determine whether the instruction was legally appropriate.'" 302 Kan. at 511 (quoting *Plummer*, 295 Kan. 156, Syl. ¶ 1).

In this case, we need not spend time or energy analyzing factual or legal appropriateness of the requested language because an apparently nearly identical twin of the language already *was* included in another instruction. The judge gave the standard PIK instruction that each crime is a separate and distinct offense, that the jury must consider each individually, and that its "agreement on a verdict must be unanimous." See *State v. Bernhardt*, 304 Kan. 460, 470, 372 P.3d 1161 (2016) (use of PIK instructions not mandatory; but, unless facts of case require modification, PIK recommendations should be followed). At oral argument before this court, counsel for Davis admitted that the language sought would merely have added emphasis to what the judge already included. Considering these circumstances, there was no error in the omission of additional unanimity language.

*Multiplicity*

Davis' final appellate challenge argues that his convictions for capital murder and rape are multiplicitous.

"Questions involving multiplicity are questions of law subject to unlimited appellate review." *State v. Belt*, 305 Kan. 381, 407, 381 P.3d 473 (2016).

When a defendant is charged with a count of capital murder under K.S.A. 2011 Supp. 21-5401(a)(4) (capital murder for killing caused during commission of, subsequent to rape), it is multiplicitous with a count charging the underlying sex crime. *Belt*, 305 Kan. 381, Syl. ¶ 4; *Appleby*, 289 Kan. 1017, Syl. ¶ 7.

Davis raises this issue for the first time on appeal without invoking an exception to the general rule precluding consideration of a constitutional issue for the first time on appeal. See Kansas Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 35) ("If the issue

26

was not raised below, there must be an explanation why the issue is properly before the court."); *State v. Godfrey*, 301 Kan. 1041, 350 P.3d 1068 (2015) (party ignores Rule 6.02[a][5] at its peril). But we have previously considered a multiplicity challenge for the first time on appeal in the interest of justice and to prevent a denial of fundamental rights. *State v. Weber*, 297 Kan. 805, 808-09, 304 P.3d 1262 (2013). We do so again here and thus reach the merits of this issue.

This challenge is controlled by our decision in *Belt*, 305 Kan. 381, which held that a conviction for attempted rape was multiplicitous with a capital murder conviction built upon it under K.S.A. 21-3439(a)(4). In such a case, rape is an element of the capital murder, and Davis is being punished for the rape by the elevation of the homicide from first-degree to capital.

CONCLUSION

Defendant Billy F. Davis, Jr., is entitled to no relief on this appeal other than reversal of his rape conviction as multiplicitous with this capital murder conviction. The judgment of the district court is affirmed in part and reversed in part.

ROSEN, J., not participating.
MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 113,537 vice Justice Rosen under the authority vested in the Supreme Court by K.S.A. 20-2616.