NOT DESIGNATED FOR PUBLICATION

No. 122,601

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JORDAN K. ROSS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed August 5, 2022. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Emma Halling*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ANTHONY J. POWELL, Court of Appeals Judge, Retired, P.J., ATCHESON, J., and RICHARD B. WALKER, S.J.

PER CURIAM: A jury sitting in Douglas County District Court convicted Defendant Jordan Ross of raping a 15-year-old girl at a residence in Lawrence during what has been described as a house party that featured a lot of drinking and apparently little or no adult supervision. Ross has challenged the conviction on the grounds his out-of-court statements should have been suppressed, the district court should have ordered a psychological evaluation of the girl, and the comments of a potential juror during the jury selection process compromised his right to a fair trial. We find Ross' claimed errors do

1

not warrant relief whether considered individually or collectively. We, therefore, affirm the conviction and the resulting sentence.

FACTUAL AND PROCEDURAL HISTORY

Because Ross has not challenged the sufficiency of the evidence, we provide an overview of the circumstances without reciting details of the encounter. The trial testimony of A.M., the girl, established the elements of rape, as charged against Ross under K.S.A. 2017 Supp. 21-5503(a)(1)(A). The verdict signifies the jurors' collective assessment that A.M.'s account was credible. We would be in no position to second-guess that determination even if Ross had disputed the sufficiency of the evidence. See *State v. Franco*, 49 Kan. App. 2d 924, 936-37, 319 P.3d 551 (2014). The point would have been legally empty, so its omission in this appeal reflects a reasonable tactical decision. See *Rice v. State*, 37 Kan. App. 2d 456, 464-65, 154 P.3d 537 (2007) (appellate counsel reasonably may be expected to cull weak points in favor of pursuing "more meritorious arguments").

In August 2017, A.M. went to a party at a house in Lawrence with her friend V.N., another underage girl, who was Ross' cousin. A.M. had met Ross a few weeks earlier but did not know him well. Ross, who was then 19 years old, drove the two girls to the party. As the evening progressed, A.M. drank alcohol and smoked marijuana and, in her own estimation, had become quite intoxicated. She and several other people gathered in an upstairs bedroom. One by one the others left until only she remained. A.M. believed she blacked out and came to as Ross took off her pants, pinned her to the bed, and had sexual intercourse with her as she repeatedly told him no. Ross left the room, and A.M. again passed out.

Using a slang phrase, Ross told another partygoer he believed he had ejaculated while having sex with A.M. A visibly distraught A.M. left the party and spent the night at

V.M.'s home with several friends. She told one of them Ross had raped her. A.M. told her mother the next day. A.M.'s mother took her to a local hospital where a forensic sexual assault examination was done. A swab of A.M.'s underwear yielded semen later matched to a DNA sample from Ross. Internal swabs of A.M. were negative for semen.

The Lawrence police department began an investigation. As we describe in more detail in our legal analysis of the issues on appeal, Officer Lindsay Bishop later interrogated Ross. During the questioning, Ross essentially admitted having sexual intercourse with A.M. but explained he thought she was older. At trial, Ross testified A.M. had manually stimulated him; he denied having intercourse with her. He said he told Bishop otherwise because he had been intimidated during their meeting.

The jury convicted Ross of rape, a severity level 1 person felony, in November 2019. At a later hearing, the district court sentenced Ross to serve 155 months in prison, the standard guidelines sentence for a defendant with no relevant criminal history. Ross has appealed.

LEGAL ANALYSIS

As we have indicated, Ross raises several distinct points on appeal and offers an argument for reversal of his conviction because of cumulative error. We take up them up serially, augmenting our preceding account of the facts as necessary.

*Suppression of Statements to Officer Bishop*

Before trial, Ross moved to suppress statements he made to Bishop when she and another officer questioned him for about an hour in an unmarked police car outside his residence. Ross contended his waiver of his *Miranda* rights and the statements themselves were involuntary and, therefore, could not be used against him at trial. See

3

*Dickerson v. United States*, 530 U.S. 428, 433-34, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); *State v. Stone*, 291 Kan. 13, 32-33, 237 P.3d 1229 (2010). At a hearing on the motion, Bishop was the only witness to testify about the questioning of Ross. The State also presented an audio recording of the interrogation. The district court denied the motion.

Ross' statements were admitted at trial over his objection, preserving the suppression issue for appeal. On appeal, Ross reprises his involuntariness argument.

In reviewing a ruling on a motion to suppress, we defer to the district court's findings of fact so long as they have support in the evidence and then make an independent determination of whether those findings justify the district court's legal conclusion. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). The State must prove the voluntariness of a defendant's statements by a preponderance of the evidence. *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013).

The voluntariness of a defendant's statement to law enforcement officers depends upon the totality of the circumstances, although the appellate courts have developed a nonexclusive set of factors to be considered. This court has set out the governing principles this way:

> "The ultimate issue is whether the statements reflect the product of a free and independent will, *i.e.*, did the individual act voluntarily? See *State v. Gilliland*, 294 Kan. 519, Syl. ¶¶ 3, 4, 276 P.3d 165 (2012); *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010); *State v. Shumway*, 30 Kan. App. 2d 836, 841-42, 50 P.3d 89, *rev. denied* 274 Kan. 1117 (2002). In short, the district court must examine the totality of the circumstances surrounding the making of the statements. Among the factors to be considered in assessing voluntariness are: '(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to

communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.' *Gilliland*, 294 Kan. 519, Syl. ¶ 3; see *Stone*, 291 Kan. at 21. A government agent may induce an involuntary statement through improper threats of harm, promises of benefit, a combination of the two, or other undue influence over the suspect. *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976); *State v. Brown*, 286 Kan. 170, 174, 182 P.3d 1205 (2008). . . .

"Voluntariness ultimately must be determined holistically. So a consideration or factor favoring the State does not directly negate another one favoring the defendant and vice versa—the outcome does not depend on a tally of factors for each side. Each relevant factor, likewise, should not be assessed in isolation. The collective effect of the circumstances drives the assessment. See *Randolph*, 297 Kan. at 326; *Stone*, 291 Kan. at 25." *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1075-76, 337 P.3d 691 (2014).

The same standards apply in determining whether defendants voluntarily waive their *Miranda* rights. In that circumstance, the waiver is a form of statement that may be communicated verbally or nonverbally. *State v. Mattox*, 280 Kan. 473, Syl. ¶ 3, 124 P.3d 6 (2005) (test for voluntariness of waiver); *State v. Paulson*, No. 108,795, 2015 WL 6444314, at *23-24 (Kan. App. 2015) (unpublished opinion) (test for voluntariness and sufficiency of defendant's nod of the head as waiver).

Based on the evidence at the suppression hearing, Bishop and a second Lawrence police officer drove to Topeka the afternoon of September 13, 2017, to interview Ross. Both were assigned as juvenile investigation officers and wore what might be described as casual plainclothes rather than typical law enforcement uniforms. The officers waited for Ross outside the townhouse where he lived. Ross arrived about 20 minutes later. Bishop approached Ross in the parking lot, identified herself, and asked him to speak with her in the car. Ross sat in the front passenger seat. Bishop sat in the driver's seat and conducted the questioning. The second officer sat behind Bishop. Initially, four Topeka

officers in two vehicles were there. Two of them left shortly after Ross arrived, and the remaining two parked their vehicle on the street some distance from Bishop's car.

Bishop questioned Ross for about an hour in the air-conditioned car. Ross was not handcuffed or otherwise restrained during the interrogation. Although both officers carried handguns, neither of them displayed or brandished a firearm. Bishop told Ross he was not under arrest, but she read him the *Miranda* warnings at the start of the questioning. After informing Ross of those rights, she invited him to waive them and speak with her. Ross asked what waiving his *Miranda* rights meant. Bishop explained it meant to set aside what she had read from the *Miranda* warning card and to agree to have a conversation without a lawyer present. Ross told Bishop that he had been interviewed by law enforcement officers in a different case and so he knew that their conversation would be used against him in court.

As we have indicated, Ross made incriminating statements during the questioning that stopped short of an outright confession to raping A.M. Here, the detailed contents of the statements don't really bear on whether they were voluntarily given. The questioning was conducted in a businesslike manner—without raised voices, threats, promises, or false representations of evidence implicating Ross in criminal wrongdoing. Toward the end of the interrogation, Ross' mother approached the car and told the officers Ross had been diagnosed as bipolar and had special needs she didn't describe.

The interrogation wound down when Ross said he needed to go to work. Bishop then handed him search warrants for his cellphone and for a DNA sample. Upon receiving the warrants, Ross said he wanted to talk with a lawyer. The questioning ended, and Ross left.

On appeal, Ross contends the circumstances were unduly coercive, rendering both his *Miranda* waiver and the statements involuntary. He relies on the physical conditions

6

under which Bishop questioned him and alludes to his being bipolar and having special needs. We dispose of the latter without extended discussion. Ross presented no evidence at the suppression hearing that he is, in fact, bipolar or that the condition would have somehow rendered his participation in the September 13 interrogation involuntary in any legal sense. Likewise, Ross offered no evidence of any special needs that might have impaired his will to resist Bishop's questioning. His mother's out-of-court statement to Bishop referring to a bipolar diagnosis and special needs has no evidentiary weight, especially against the circumstances indicating Ross understood what was going on and exercised his uninhibited free will in speaking with Bishop. Ross was fluent in English, and his behavior over the course of the questioning did not display any mental condition indicative of intellectual or psychological impairment making him unduly susceptible to threats, promises, or other suggestions.

The location and tenor of the questioning weigh against undue coercion or involuntariness. The interrogation occurred in a public place—a car parked adjacent to private residences during daylight hours—so anyone happening by could see what was going on. That sort of public visibility discourages physically intimidating interrogation techniques and tends to foster a sense of security against such abuse in the person being questioned, in contrast to questioning conducted in a windowless interrogation room inside a secured law enforcement complex. See *Berkemer v. McCarty*, 468 U.S. 420, 437-40, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (recognizing that a public traffic stop typically lacks the coercive atmosphere of a station house detention); *Fernandez-Torres*, 50 Kan. App. 2d at 1079 ("Interrogation rooms, by design, tend to be cloistered, thereby imparting a sense of isolation that itself can be coercive."). Thus, Ross was not cut off from the outside world, although he never asked to communicate with anyone during the questioning. Similarly, while Ross didn't ask to leave during the interrogation, Bishop never refused such a request and then continued interrogating him. Ross was not handcuffed or otherwise physically restrained, cutting against undue coercion.

7

The questioning was free of promises, threats, or psychological ploys designed to lead a suspect into making incriminating admissions. See *Stone*, 291 Kan. at 29-30; *Fernandez-Torres*, 50 Kan. App. 2d at 1081-82. Those considerations bear on the manner of the questioning and the fairness of the officers. Here, they also undermine Ross' claim of impermissible coercion and involuntariness. Early on in the meeting, Bishop fairly explained to Ross what "waive" meant in conjunction with the *Miranda* warnings. And Ross articulated his understanding that what he said could be used against him.

This plainly was not an interrogation in which relays of law enforcement officers sought to break a suspect's will to resist by physically and mentally depleting him or her with hours of questioning in a closed environment using false or misleading misrepresentations as a wedge. See *Paulson*, 2015 WL 6444314, at *24. As a practical matter, Ross' claim of involuntariness seems to be undone by his own actions when, an hour into the questioning, he invoked his right to speak with a lawyer after Bishop handed him the search warrants. The very act of asserting one of his *Miranda* rights suggests Ross both understood those rights and was sufficiently in command of his faculties to resist Bishop's investigative efforts and, indeed, made a deliberate (and voluntary) choice do so at that point. Cf. *State v. Orange*, No. 108,806, 2014 WL 37688, at *4 (Kan. App. 2014) (unpublished opinion) (four-hour police interrogation unlikely impermissibly coercive rendering statements involuntary when defendant "refused to agree that he had intentionally caused the accident—resistance wholly contrary to a will overborne and broken by law enforcement pressure to confess").

Examining all of those circumstances, we find ample support for the district court's findings and ultimate conclusion that Ross' statements to Bishop during the interrogation in the vehicle parked outside his residence were voluntary and freely made. Ross similarly understood and voluntarily waived his *Miranda* rights at the start of the questioning. The district court, therefore, properly admitted the statements as evidence during the trial.

8

Because of those rulings, we need not separately determine whether Bishop's questioning of Ross amounted to a custodial interrogation. Depending on the circumstances, a person may make coerced and involuntary statements either in a custodial interrogation or during noncustodial questioning. See *Beckwith v. United States*, 425 U.S. 341, 347-48, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976) (recognizing that particular circumstances could render a suspect's statements to government agents involuntary even though interrogation was not custodial); *United States v. Preston*, 751 F.3d 1008, 1013, 1015-16 (9th Cir. 2014) (en banc); *State v. Horn*, No. 114,078, 2016 WL 7494377, at *3 (Kan. App. 2016) (unpublished opinion). An interrogation is custodial if a reasonable person in the position of the subject being questioned would not feel free to terminate that questioning or to leave. See *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012). If law enforcement officers fail to inform the subject of his or her *Miranda* rights and do not obtain a valid waiver of those rights at the start of a custodial interrogation, the government may not use those statements in its case-in-chief at trial. *Oregon v. Elstad*, 470 U.S. 298, 317-18, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *United States v. Smith*, 831 F.3d 793, 798 (7th Cir. 2016). In short, the custodial or noncustodial character of the interrogation has no direct bearing on either Ross' claim of involuntariness or the district court's determination of that claim.

*A.M.'s Recording of Call with Ross*

At Bishop's suggestion shortly after she began investigating this case, A.M. recorded a cellphone call with Ross. During the call, A.M. falsely told Ross she thought she might be pregnant. Ross didn't deny the possibility, thus at least circumstantially confirming he had sexual relations with A.M.

Before trial, Ross moved to suppress the recording on the grounds A.M. acted as a government agent and the communication, therefore, amounted to a constitutionally

impermissible interrogation. The district court denied the motion, finding A.M. was not a government actor when she spoke with Ross. The recording was offered and admitted at trial as part of the State's case against Ross over his objection. He has appealed the denial of his motion to suppress.

We apply the same bifurcated standard of review that governed the first issue, deferring to the district court's factual findings and examining without deference whether those findings support the ultimate legal conclusion.

The law recognizes that a private citizen may act in league with and at the behest of government agents and, thus, functionally become an extension of those agents. When that happens, the private citizen—as a government agent—is bound by the constitutional limitations applicable to state and municipal officers and employees. *State v. Pursley*, 238 Kan. 253, 261-62, 710 P.2d 1231 (1985); *State v. Welsh*, 26 Kan. App. 2d 362, 363, 988 P.2d 261 (1999); *State v. Bohannon*, 3 Kan. App. 2d 448, 452, 596 P.2d 190 (1979); *United States v. Cook*, 599 F.3d 1208, 1215-16 (10th Cir. 2010). Pertinent here, those limitations include prohibitions on unreasonable government searches and seizures and on compelled self-incrimination found, respectively, in the Fourth and Fifth Amendments to the United States Constitution. Conversely, private citizens acting on their own may gather information and potential evidence pertaining to criminal wrongdoing free of those strictures and then turn their reconnaissance over to law enforcement officers. Government agents, in turn, may use that material to prosecute apparent wrongdoers precisely because it has come to them through a private source rather than as a product of their own investigation. *Welsh*, 26 Kan. App. 2d at 363; *Bohannon*, 3 Kan. App. 2d at 452; 1 LaFave, Search and Seizure §§ 1.8, 1.8(a) (6th ed. 2020).[*]

[*]Such citizen investigators do not, however, act with unconditional impunity. They potentially face civil or criminal liability if their methods are demonstrably unlawful. We do not have that sort of issue lurking in the background here.

10

The test to determine when a private citizen becomes a government agent rests on the totality of the circumstances in any given instance. So the resolution of cases at the extremes may be fairly easy, while those in the middle may be murky. Basically, private citizens become government agents if they act both with the intention of assisting law enforcement officers and with the knowledge and acquiescence of those officers. *Welsh*, 26 Kan. App. 2d at 363; *Bohannon*, 3 Kan. App. 2d at 452-53. The government actors must "affirmatively encourage" or "have some active part in" the private citizens' investigatory endeavor. *Welsh*, 26 Kan. App. 2d at 363.

Here, Bishop suggested A.M. call Ross and maneuver him into admitting he had sex with her against her will. In describing the plan to A.M., Bishop explained that Ross would be more likely to open up to her than a police officer. Bishop also outlined possible ploys A.M. could use, including telling Ross she thought she might be pregnant. And Bishop supplied A.M. with a recording device. A couple of weeks later, A.M. spoke with Ross and turned a recording of their call over to Bishop. The degree of Bishop's involvement in bringing about the call between A.M. and Ross, including coaching on techniques likely to elicit incriminating responses and furnishing means to preserve the content of the call as evidence, is like what happened in *Cook*, where the appellate court acknowledged an inmate informant acted as a government agent. 599 F.3d at 1211, 1215.

We have serious reservations about the legal correctness of the district court's determination that A.M. was not a government agent when she called and spoke with Ross. For purposes of this appeal, we assume without deciding that A.M. functioned as a government agent during the telephone call. Nonetheless, we may affirm the district court if it otherwise reached the correct legal outcome in declining to suppress the recording. See *State v. Farmer*, 312 Kan. 761, 765, 480 P.3d 155 (2021). In that respect, the victory we presume for Ross is an ephemeral one.

11

The telephone call between A.M. and Ross plainly was not a custodial interrogation. He merely had to hang up to end the contact and the communication. Accordingly, Ross was not required to be informed of his *Miranda* rights. *State v. Lewis*, 299 Kan. 828, 834, 326 P.3d 387 (2014); see *Cook*, 599 F.3d at 1214-15. The absence of a *Miranda* warning advising Ross of those rights does not warrant exclusion of the recording.

The circumstances of the call were not unduly coercive and did not render Ross' statements involuntary considering the totality of the circumstances and the factors we have already outlined. Again, nothing about the call would suggest Ross' free will had been dissipated, causing him to speak to A.M. involuntarily. We do not belabor our analysis by going through each of the criteria laid out in *State v. Gilliland*, 294 Kan. 519, 276 P.3d 165 (2012), *Fernandez-Torres*, and elsewhere.

On appeal, Ross submits A.M.'s false representation that she was pregnant flips that calculus and requires suppression of his statements. We disagree. First, law enforcement officers (and, thus, private citizens acting as their agents) may deliberately make factual misrepresentations when questioning subjects to pry out incriminating admissions. See *State v. Randolph*, 297 Kan. 320, 333-34, 301 P.3d 300 (2013). Such interrogation techniques do not categorically taint the questioning and, rather, reflect one component of the overall circumstances that may be given more or less significance depending on the nature and extent of the false representations. Second, nothing in the evidence indicates Ross was emotionally or intellectually undone as a result of A.M.'s assertion she was pregnant.

Ross has failed to show his statements in the recorded telephone call with A.M. were involuntary or the product of impermissible coercion undermining his free will. Thus, they could not have been suppressed for that reason. Even if A.M. acted as a

12

government agent during the call, the district court reached the correct legal conclusion in ruling the statements could be admitted as evidence against Ross during the trial.

*Request for Psychological Evaluation of A.M.*

Before trial, Ross filed a motion requesting the district court order a psychological examination of A.M. The district court denied the motion after considering the common-law factors guiding such a request. Ross has appealed the ruling.

Before turning to our analysis of the issue, we mention that the Legislature has now statutorily precluded district courts from requiring mental examinations of crime victims. K.S.A. 2021 Supp. 21-5112. The legislation went into effect in July 2021 and does not govern this appeal. We apply the law applicable to psychological examinations as it was in 2019 at the time of Ross' trial. See *State v. Page*, 303 Kan. 548, 551-52, 363 P.3d 391 (2015) (evidentiary and procedural rules in effect at time of criminal defendant's trial applied on appeal).

In 2019, district courts had the judicial discretion to grant or deny defense motions for psychological evaluations of persons asserting they had been victims of sex crimes. *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979). We, therefore, review the denial of Ross' motion for an abuse of that discretion—an exceptionally deferential standard. A district court exceeds its discretion by ruling in a way no reasonable judicial officer would under the circumstances, by ignoring controlling facts or relying on unproven factual representations, or by acting outside the legal framework appropriate to the issue. See *State v. Darrah*, 309 Kan. 1222, 1227, 442 P.3d 1049 (2019); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011). Ross bears the burden of establishing an abuse of discretion. See *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015).

The Kansas Supreme Court developed half a dozen criteria to guide trial judges in deciding whether to order a mental examination in advance of a victim's testimony. *State v. Berriozabal*, 291 Kan. 568, 581, 243 P.3d 352 (2010); *Gregg*, 226 Kan. at 490. The criteria consider the victim's demonstrable "mental instability" and "lack of veracity," whether the victim has lodged false allegations of sexual abuse against other persons, and indicators the victim may have an unusual understanding of "what it means to tell the truth." *Berriozabal*, 291 Kan. at 581. The district court may consider evidence corroborating the victim's accusations against the defendant. If the defense request looks to be a "fishing expedition," the district court may weigh that against allowing the examination. 291 Kan. at 581. Collectively, those considerations create an especially demanding legal framework for granting the motion. As the court has stated, a defendant must make "a showing of compelling circumstances" to warrant an examination. 291 Kan. at 581.

On appeal, Ross argues he was entitled to a psychological examination of A.M. for several reasons. First, her preliminary hearing testimony included details of the encounter that went beyond or deviated in some particulars from what the police reports contained. Second, A.M. mentioned to a friend that the incident caused her to have "flashbacks," suggesting previous sexual abuse. Ross also argues A.M. had consumed alcohol and marijuana at the party. And she arguably had an incentive to allege she had been raped to avoid parental discipline for her partying. Much of that, although not necessarily all of it, might be fodder for cross-examination of A.M at trial. None of it, however, indicates A.M. suffered from some form of mental illness or impairment affecting her ability to accurately perceive events or to recall them. The record contains nothing to suggest A.M. ever made false accusations of sexual abuse, could not understand her legal obligation as a witness to tell the truth, or had any form of mental illness. See *State v. Coggs*, No. 104,934, 2012 WL 5364658, at *3 (Kan. App. 2012) ("An examination might be warranted if a victim suffered from an illness impairing his or her ability to accurately

14

perceive or recall events or disposed him or her to tell falsehoods. But that case is not this case.").

Ross also incorrectly posits A.M.'s account lacked corroboration. Immediately afterward, A.M. was visibly upset and quickly confided to a friend that Ross had raped her. Later, Ross admitted to Bishop that he and A.M. had sexual intercourse. Those circumstances, though admittedly less than conclusive, tend to support A.M.'s accusation. So that argument for a psychological evaluation fails. Moreover, a factual conflict between the account of the accuser and the account of the accused has never been a sufficient ground for a psychological examination. If that were the standard, psychological examinations would have been routine in sex crime prosecutions.

Ultimately, Ross' request takes on the cast of the impermissible fishing expedition undertaken not to explore legitimate indicators of a psychological condition or maladaptive behavior bearing on credibility but to harass and intimidate. See *State v. Eddy*, 299 Kan. 29, 34, 321 P.3d 12 (2014) ("Appellate courts are typically loathe to find an abuse of discretion when a district court refuses to order a psychological examination of a young sex abuse victim, unless the circumstances are extraordinary."). We readily conclude the district court did not abuse its discretion in denying Ross' motion.

 *Comments of Potential Juror*

During the jury selection process, one of the potential jurors said he believed others in the group would be inclined to find Ross not guilty because he is Black. The potential juror also remarked that he was a Republican in a Democratic town and had had "problems" as a result, so he wondered whether the jury would have a hard time reaching a verdict if he were selected to serve. Ross moved for a mistrial, arguing those comments from L.R., the potential juror, sufficiently tainted the selection process and negatively influenced the other individuals in the pool that his right to an impartial jury had been

15

compromised. The district court denied the request for a mistrial. The district court later excused L.R., and he did not sit on the jury.

Ross has reprised the argument on appeal and challenges the ruling on the mistrial motion and contends the jurors deciding the case must have been impermissibly influenced by L.R.'s remarks to his detriment—a structural error requiring a new trial without any showing of prejudice. We are unpersuaded in either respect.

During jury selection, the prosecutor understandably sought to probe the potential jurors' views about race, policing, and the interaction of law enforcement with citizens in the community. One potential juror said she believed some, but not all, police officers regularly lie in the course of their work. Another potential juror spoke about systemic racism. And a third raised concerns about how explicit and implicit racial bias in the legal system affects minorities. On the heels of those comments, the prosecutor asked if anyone else had similar or different views. L.R. spoke up and offered this:

> "Yes. Actually we keep hearing about the racism and all this, and I think we are way overinfluenced by media that is run by one party. And it just seems to, I mean, it's white man bad, that's just all it is. In fact, I think the defendant is halfway to being exonerated because he's black because any potential white jurors will not, I mean especially in this town, I mean, if you—if you, any of us that vote to convict him are racist."

As the prosecutor sought to follow-up, L.R. interjected, "It's just that from what I am hearing now, the people—the way they feel, we might have a problem agreeing."

The prosecutor then asked L.R. if he thought the differences in viewpoints among the potential jurors might inhibit him in fully discussing the evidence and the law during deliberations should he serve on the jury. L.R. responded:

16

"No, I don't think I would have a problem, but I just wonder about the potential of people with such differing, strong differing views. I am a Republican in a Democratic town. I have had a lot of problems because of it and I am just wondering, as far as hearing the facts—I mean, the fact that he is black doesn't matter to me, but I am wondering about the potential for applying the facts, disregarding everything else, and applying the facts to the law."

The prosecutor then moved on to another topic.

Partway through the selection process, Ross (through his lawyer) requested a mistrial based on L.R.'s comments. The district court took up the motion outside the presence of the potential jurors and found the remarks did not undermine the selection process or Ross' rights. The district court declined to question the potential jurors about what effect, if any, L.R.'s remarks had on them, reasoning that would give undue attention to the matter. As we have indicated, the district court denied the requested mistrial.

With the lawyers and Ross present, the district court conducted closed, individual questioning of several potential jurors—principally those who had been victims of sexual assault or had close family or friends who were victimized. The district court requested L.R. participate in that individual examination. During that process, L.R. assured the district court he could be fair and would listen to the evidence. He reiterated his concern that other jurors might have a problem with him because he is a Republican and a supporter of Donald J. Trump. Without a challenge for cause from either side, the district court excused L.R. because it would not be "fair" to ask him to serve on the jury under the circumstances. Neither lawyer objected, and that decision is not before us.

When all of the remaining jurors reconvened, Ross' lawyer brought up L.R.'s "halfway to being exonerated" comment to prompt additional discussion about race, especially given what he characterized as a racial imbalance in the jury pool. Several

17

individuals, including some who had spoken earlier, offered their views. L.R. did not add to the discussion then, since he was no longer present.

By statute, a criminal defendant may move for a mistrial when "[p]rejudicial conduct . . . makes it impossible to proceed with the trial without injustice." K.S.A. 22-3423(1)(c). The district court employs a two-step analytical tool in considering a motion for a mistrial. First, the district court must determine whether there has been "some fundamental failure" in the judicial process. *State v. Sherman*, 305 Kan. 88, 118, 378 P.3d 1060 (2016). If so, the district court should consider whether corrective steps may mitigate the harm and whether the residual prejudice creates an injustice requiring abandonment of the trial. 305 Kan. at 118-19. An appellate court reviews the ultimate ruling for an abuse of judicial discretion using the standard we have already outlined. 305 Kan. at 118.

To place this issue in context, we need to consider the purpose of jury selection or voir dire, since L.R. made his comments during that part of the trial. We recently discussed the purpose of jury selection:

> "District courts permit the lawyers to question potential jurors to explore for experiences or preconceived notions—a euphemism for biases and prejudices—that might cloud their ability to be fair in the case at hand. See K.S.A. 2020 Supp. 22-3408(3) (lawyers shall be permitted to question potential jurors subject to district court's reasonable restrictions; district court may also examine potential jurors); see also *State v. Hudgins*, 301 Kan. 629, 635, 346 P.3d 1062 (2015) (outlining purpose of selection process and district court's authority to regulate lawyers' questioning of potential jurors). What might be a serious preconception or blind spot for a juror in one case or a type of case might not be in others. The give-and-take necessarily touches on issues and evidence that may arise during the trial, permitting the lawyers to gauge prospective jurors' overt views and more subjective perceptions. The reconnaissance allows the lawyers to challenge potential jurors for legal cause and to use a statutorily allotted number of peremptory strikes to remove remaining candidates who may harbor inhospitable perspectives on a party, a

18

claim, or some aspect of the anticipated evidence. See K.S.A. 22-3410 (identifying grounds supporting challenges for cause); K.S.A. 2020 Supp. 22-3412 (peremptory challenges of prospective jurors)." *State v. Spackman*, No. 122,021, 2021 WL 4929156, at *7 (Kan. App. 2021) (unpublished opinion).

By its very design, that selection process may, in any given case, lead to the discussion of intimate topics, e.g., a potential juror's predisposition as a victim of sexual abuse in a prosecution for rape, and potentially volatile ones, e.g., race and policing. This case carried that sort of emotional and explosive overlay. The district court properly permitted the lawyers to venture into those areas in a clinical way to elicit the views of the individuals summoned as potential jurors.

L.R.'s comments were both pointed and barbed. He was, in his candor, a thorny presence jabbing at other potential jurors and their expressed concerns about racial prejudice and the criminal justice process. The district court mentioned that several potential jurors physically stiffened up when L.R. spoke—body language indicative of a negative reaction to his comments.

From our perspective—as a panel that includes two members having decades of experience as district court judges—we see no failure of the trial process (fundamental or otherwise). The selection process functioned as intended by bringing to the fore the viewpoints of L.R. and other prospective jurors on matters instructive on their potential service. The matters may have been fraught, but that doesn't create failure or unfairness. If jury selection were confined to the benign and the banal, it might work as some sort of social icebreaker for those chosen to hear the case, but it would be a near worthless exercise in probing for preconceptions and attitudes incompatible with the fairmindedness the parties have a right to expect from those sitting in judgment of them.

L.R. may have shown himself to be less than an ideal juror for all kinds of reasons. But the opinions he voiced did not undermine the trial process or Ross' right to a fair jury.

19

This was not a case in which a potential juror blurted out incendiary and patently inadmissible information about one of the litigants or the underlying facts, thereby exposing the jury panel to material they shouldn't hear. That can create a prejudicial spill requiring more than a simple cleanup. Even then, a mistrial may be averted. See *State v. Warren*, 302 Kan. 601, 605-11, 356 P.3d 396 (2015) (no mistrial when potential juror expressed personal safety concerns because defendant was charged with a double homicide; cataloging similar cases). Nothing remotely comparable happened here. The district court acted well within its judicial discretion in denying the motion for a mistrial.

Ross offers a complementary argument that L.R.'s comments during the jury selection process amounted to a structural error relieving him of any obligation to show actual prejudice to obtain a new trial. First, Ross points out that a criminal defendant has a fundamental constitutional right to an impartial fact-finder, be it a judge or a jury. That is indisputably true. See *State v. Robinson*, 303 Kan. at 60 (criminal defendant's right to impartial jury guaranteed in Sixth Amendment to United States Constitution); see also *State v. Bodine*, 313 Kan. 378, 401, 486 P.3d 551 (2021) (characterizing criminal defendant's right to impartial jury as "fundamental"). Likewise, the trial of a criminal defendant in front of a less than impartial fact-finder amounts to structural error. *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); *Rose v. Clark*, 478 U.S. 570, 578, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) ("Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury."). And it is true that a structural error undermines the core trial process in a way obviating the need to prove actual prejudice. The very existence of the error requires relief. See *Sullivan v. Louisiana*, 508 U.S. 275, 281-82, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

Although Ross has strung together a series of accurately stated legal principles, he falters at the outset of his argument. Ross has offered nothing even hinting the 12 jurors who rendered the guilty verdict were anything less than impartial. Their listening to L.R.

during the jury selection process didn't inject them with some prejudice against Ross or bias for the State. The key factual premise upon which Ross anchors his structural error claim has no support. In turn, those legal principles, notwithstanding their abstract accuracy, simply don't apply here.

*Cumulative error*

For his concluding issue on appeal, Ross submits he was deprived of a fair trial because of cumulative error. Appellate courts will weigh the collective impact of trial errors and may grant relief if the aggregated impact of the deficiencies has deprived the defendant of a fair hearing even when the errors considered individually would not necessarily require reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014).

Here, we have found no errors based on the four specific points Ross has raised. Obviously, there can be no cumulative error when there is no error at all. *State v. Butler*, 307 Kan. 831, 868, 416 P.3d 116 (2018). We need say no more.

Affirmed.